I. HOWARD LEHMAN et al., as Trustees, Plaintiffs, *v.* BRUCE CAMERON et al., Defendants.

Supreme Court, Trial Term, New York County, April 19, 1955.

*Edward D. Burns* and *John H. Kiser* for plaintiffs.

*David Haar* for defendants.

HOFSTADTER, J. This action was brought by trustees in reorganization under chapter 10 of the Bankruptcy Act (U. S. Code, tit. 11, § 501 *et seq.*) to recover payments made to certain laymen and their respective attorneys during the period from October 28, 1948 to June 21, 1949.

Forty-two separate causes of action are alleged in the complaint. A forty-third cause, against officers and directors of the debtor corporation, was severed, and tried separately by a Special Referee. Of the remaining forty-two causes, twenty-four (in which the defendants were all represented by the same counsel) were tried by this court, after a jury was waived; and the other eighteen were severed and returned to Part II to be assigned for trial in the discretion of the Justice presiding in that part.*

---

\* The second cause of action was settled before trial. Causes of action numbered First, Fifth, Seventh, Eighth, Thirteenth, Fourteenth, Fifteenth, Seventeenth, Eighteenth, Twentieth, Twenty-first, Twenty-second, Twenty-third, Twenty-fourth, Twenty-sixth, Twenty-seventh, Twenty-eighth, Thirty-first, Thirty-second, Thirty-fifth, Thirty-sixth, Thirty-eighth, Thirty-ninth and Forty-second, were tried.

The causes of action which have been tried are predicated upon section 70 of the Bankruptcy Act, which is applicable to chapter 10 proceedings (U. S. Code, tit. 11, § 502). In the main, the salient facts are not in dispute.

On October 25, 1948, a petition was filed in the United States District Court for the Southern District of New York against the debtor corporation for its reorganization under chapter 10 of the Bankruptcy Act. An amended petition was filed on December 7, 1948. By order of the United States District Court, dated June 21, 1949, the debtor corporation (herinafter referred to as " Third Avenue ") was placed in reorganization and three trustees were appointed. Only one trustee is presently acting, and he is the sole remaining plaintiff in this action.

Upon the date of the filing of the original petition for reorganization, there were pending, in different State courts, actions brought against Third Avenue by the lay defendants herein to recover damages for personal injuries alleged to have been sustained as a result of the negligence of Third Avenue. Those causes of action arose from accidents occurring at various times between September 16, 1942, through February 25, 1948. The lawyer defendants herein acted as attorneys for the plaintiffs in those cases.

Between November 24, 1948 and May 20, 1949, Third Avenue made payments to the defendants in settlement of those personal injury actions. In five instances, payments satisfied judgments which had been obtained following trials of the negligence actions.

A uniform pattern was followed by the defendants in disposing of the payments. The checks were deposited by the lawyers in special accounts; the lawyers deducted their fees and disbursements; and the balances were received by the clients. In all cases, the compensation of the attorneys was governed by contingent retainer agreements executed and filed in accordance with law.

Plainly, all the payments were made by Third Avenue during the period intervening between the filing of the petition for reorganization and the allowance thereof by the District Court. However, upon the adjudication in June, 1949, all the property of the debtor corporation vested in the trustees as of the date of the filing of the petition. (*Taylor* v. *Sternberg*, 293 U. S. 470.)

Under paragraph (1) of subdivision d of section 70 of the Bankruptcy Act (U. S. Code, tit. 11, § 110, subd. [d], par. [1]), a transfer of any of the property of the bankrupt is valid if made to a " person acting in good faith * * * for a present

fair equivalent value or, if not made for a present fair equivalent value, then to the extent of the present consideration actually paid therefor ''. It is there further provided that a person asserting the validity of a transfer has the burden of proof, and that a person having actual knowledge of such pending bankruptcy is deemed not to have acted in good faith unless he had reasonable cause to believe the petition was not well founded.

Thus, the validity of the payments to defendants herein depends upon whether the transfers were made for a '' present fair equivalent value '' or '' present consideration '' to persons '' acting in good faith ''. Since I have concluded that the payments were not supported by a '' present fair equivalent value '' or '' present consideration '' within the meaning and contemplation of subdivision d of section 70 of the Bankruptcy Act, decision on the question of '' good faith '' becomes unnecessary. However, were it requisite for the decision, I was prepared to find from the evidence that the defendants acted in good faith and received the payments without knowledge of the pending bankruptcy proceeding.

Upon the issue of '' present fair equivalent value '' or '' present consideration '', there is very little to distinguish the cases before me from two recent decisions in this court, wherein the right of the trustee to recover payments, made in settlement of claims for damages for personal injuries, was upheld. There, as here, the injuries were sustained before the filing of the petition for reorganization, and the payments were made in the interim period between the filing of the petition and the adjudication. In *Lehman* v. *Quigley* (118 N. Y. S. 2d 579), the payment was made in April, 1949, in satisfaction of a judgment entered that month after trial of the personal injury action. In a decision permitting the trustee to recover the payment, DINEEN, J., discussed subdivision d of section 70 of the Bankruptcy Act (U. S. Code, tit. 11, § 110, subd. [d]) and the significance of the language referring to '' present '' value or consideration. The learned Justice there said (p. 582): '' As those terms referring to present consideration are used in Bankruptcy matters, a careful study of the authorities and text writers seems to indicate that what is meant and intended is not a reduction of the liabilities but an increase or exchange of assets and that the transaction should result in an increase of the common fund. Payment to defendants acted only so as to reduce liabilities.''

Again, in *Lehman* v. *Cameron* (124 N. Y. S. 2d 490), the late Justice Corcoran, in deciding a motion for summary judgment to dismiss one of the very causes of action tried before me, had this to say (p. 492): "It is not sufficient for the defendant to establish his good faith. He must also establish that the transfer was made for a present fair equivalent value. The 'present fair equivalent value' in subdivision d (1) of section 70 of the Bankruptcy Act means that there must be an increase or exchange in the corporation's assets, and not merely a reduction of its liabilities. In this case there was no receipt by the bankrupt corporation of present equivalent value. There was, in fact, a decrease in the common fund available to all the creditors."

The conclusions expressed in the above-cited cases are in accord with the views of recognized authorities in the field of bankruptcy law. (See IV Remington on Bankruptcy [4th ed.], p. 632, and 1 Gerdes on Corporate Reorganizations, § 510, p. 784.)

Patently, when the transfers were made to the defendants herein, no *present* consideration was received by the trustees — there was merely a *pro tanto* reduction of debts and liabilities. The assets available for distribution to other creditors and claimants were diminished to the extent of the payments made.

Defendants seek to avoid the implications of this lack of *present* value or consideration, as envisaged by subdivision d of section 70, by urging that the court consider the action as one for "money had and received" to be disposed of under broad principles of "equity". Application of equitable doctrines, they argue, would require scrutiny of possible detriments suffered by defendants and the consequences of a recovery by the trustee. This contention, however, overlooks the prime consideration that the cause of action here sought to be enforced is one created by the Bankruptcy Act and is not a creature of the common law. Even bankruptcy courts, which are essentially courts of equity administering a bankrupt's estate, are bound by the provisions of specific statutes. This court may not amend the statute by superimposing "equitable" conditions not found therein. The statute sets the definite limits beyond which this court may not go to protect any transfers.

Moreover, I think defendants exaggerate their plight in the event of recovery by plaintiff. There is no doubt that they will be permitted to file their claims in the reorganization court. Since the Statute of Limitations had not run against their causes of action for damages for personal injuries when the petition

for reorganization was filed, the statute is tolled until the proceeding is concluded. (U. S. Code, tit. 11, § 661.) Thus even if subdivision d of section 70 could be construed as permitting the invocation of an estoppel, the facts would not justify it here.

Nor did those defendants, whose personal injury actions had been reduced to judgment, part with any present consideration when they satisfied the judgments. Defendants are in error when they contend that these judgments constituted liens and that they could have issued executions against the property of the debtor corporation. No valid judgment lien can arise after the filing of a petition in bankruptcy. (*Lazarus* v. *Prentice,* 234 U. S. 263, 266; *Lockhart* v. *Garden City Bank & Trust Co.,* 116 F. 2d 658, 661.) Furthermore, as already indicated hereinabove, it is settled that upon an adjudication in bankruptcy, the property of the bankrupt vests in the trustee as of the date of the filing of the petition. (*Taylor* v. *Sternberg, supra.*) And, under subdivision d of section 70 of the Bankruptcy Act (U. S. Code, tit. 11, § 110, subd. [d], par. [5]), '' no transfer by or in behalf of the bankrupt after the date of bankruptcy shall be valid against the trustee ''. The creation of a lien by legal proceedings is a transfer under the Bankruptcy Act. (§ 1, subd. [30].) Consequently, any purported judgment liens were invalid as against the trustees, since they arose by reason of outstanding claims, and not in exchange for some new property passing into the debtor's estate.

Defendants' appeal to the equitable powers of this court overlooks an equitable consideration operating in favor of plaintiff. One of the great maxims of equity is that equity is equality. The core of the Bankruptcy Act is equality of distribution. (*Sampsell* v. *Imperial Paper Corp.,* 313 U. S. 215, 219.) Application of true equity herein would reject a situation where the present defendants would be placed in a more favorable position than other tort claimants and their attorneys, who were not paid during the period from October, 1948 to June, 1949, and who have been required to file their claims in the reorganization proceeding.

Nor do I find any merit in defendants' contention that the payments made to them were from '' after-acquired '' property. While I think that the evidence adduced as to the sources of the moneys was relevant, it has been established that such moneys were the proceeds or result of the use of property owned by the debtor at the time the petition was filed. It was therefore not '' after-acquired '' property and vested in the trustees (6 Collier

on Bankruptcy [14th ed.], § 8.04, p. 2421; *Weiss* v. *Fleetwood Bank,* 261 App. Div. 572).

Hence, the transfers made to the defendants during the pendency of the bankruptcy proceedings clearly depleted the estate available for distribution to the creditors. The money having been paid to defendants on account of antecedent indebtednesses, and not in exchange for new assets passing into the bankrupt's estate, it must be returned.

However, I can not accept the argument made by the trustee that the lawyer defendants are required to return the full amount paid to them and their clients. The mode of transfer, in the joint names of the client and attorney, does not make the lawyer jointly and severally liable for the full amount. The analogy to conversion actions, which is pressed by the trustee, has no relevance here. The payments were not unlawful, but subject to recall under section 70 of the Bankruptcy Act. In acting merely as conduits through whom payments to their clients passed, the attorneys were pursuing standard procedure adopted to protect their liens and the rights of their clients. Any other method may well have violated the rules of the Appellate Division applicable to such cases. In distributing the payments in a manner conforming with ethical practice, the attorneys have not subjected themselves to any additional liability. The judgment to be entered herein will therefore be directed against the clients for the moneys received by them and against the attorneys only to the extent of the amounts actually kept by them for their services and disbursements. Any other course would indeed be most inequitable and would shock the conscience of the court. Of course, the plaintiff is entitled to interest at the legal rate. (*Matter of National Motorship Corp.,* 96 F. 2d 88; *Lehman* v. *Quigley, supra.*)

Plaintiff's objections to the receipt of evidence, which are listed in pages 28-32 of plaintiff's memorandum are all overruled.

I can not leave the matter here. In all the forty-two claims which became the subject matter of this action, a contingent fee arrangement obtained. There has been thus forced upon my attention a renewed consideration, all too painful, of the inequity and abuse incident to that practice generally. The observations I feel impelled to make are not intended as any reflection on the individual defendants here.

As the Report of the Advisory Committee (Association of the Bar — 1952) properly points out, contingent fees serve a socially

useful purpose.* They enable the client of limited means to procure competent legal assistance, and have their roots in the alertness of the Bar to the needs of the average citizen of modest economic status.

In recent times, however, this purpose has been perverted. It is now common practice in the city of New York for attorneys in personal injury actions to require a fixed 50% retainer (or approximately that) without regard to the work involved. The commercial " law forms " in use in many of these offices incorporate the 50% in the *printed* matter. Thus, the original frame of reference, i.e., service to the public, has become inverted to advantage to counsel. I do not suggest that any individual practitioner is to be censured for this mutation of purpose. Indeed, the specialist in personal injury actions, must, in turn, often divide his fee equally with a forwarding attorney whose connection with the case is purely nominal; he is as much a victim of a distorted perspective as is his client. Our approach to the problem must be not one of assessing blame but rather of offering remedy. The proliferation of the 50% contingent fee in personal injury actions has so spread throughout the legal body that drastic cure is required.

It is high time that all contingent fees in accident actions be subject to being fixed by the court after final disposition. Such is now the practice in infants' cases. Respectable opinion exists that this required reform can be accomplished by rule of court notwithstanding the provision in the statute that the " compensation of an attorney * * * is governed by agreement, express or implied, which is not restrained by law " (Judiciary Law, § 474). If, however, statutory action is required, it should be sought forthwith within the present mandate for improved court administration. A national magazine recently characterized the fixed contingency fee as " unconscionable! " Reorganization of the court structure and rendering its procedures more responsive to modern needs is important; but it is indispensable that a spirit of fair play prevail in the halls of justice. Canon

---

* In New York, and in the United States generally, the contingent fee has long been given validity. England, however, views such a contract between attorney and client in the same dubious light as Common Law Champerty and Maintenance, and it is prohibited under the Solicitors Act of 1932. This difference in mores is, perhaps, not so much a matter of ethics as of history. In the eyes of our pioneering forebears the wager of fortune never bore the moral taint that gaming acquired in the more settled British community. In our legal tradition the contingent fee finds its historic respectability in such an eminent practitioner as Daniel Webster who made frequent use of this type of financial arrangement.

13 of the Professional Ethics adumbrates the solution suggested; it would do much to eliminate the largely undeserved disrepute, distressing to the Bench and Bar at large, into which the so-called " negligence lawyer " has fallen.

In the personal injury action, with its now almost constant 50% contingent fee, the entire circuit of legal procedure is subverted from beginning to end. The present standard inevitably puts a premium on solicitation that makes the recurrent investigation and sporadic prosecution of " ambulance chasing " futile, if not absurd. It encourages unjust suits and skirts the periphery of fraud in raising claims and of perjury in their prosecution. It gives rise to the harassment of innocent persons who are needlessly made defendants in sham actions brought more for nuisance value than on merit — notably, for instance, malpractice suits regarded by lawyer and insurance company alike as vexatious and pressure litigation. It generates a glut of frivolous actions which create the unhealthy congestion that plagues our courts. And, in so doing, it results in a breakdown in procedures, causing other litigants to resort to nonjudicial forums — such as arbitration — with a resultant loss of prestige and earnings for the Bar generally.

The evil spreads beyond the confines of its legal sphere to a segment of the medical profession — " a small band of medical mercenaries " Judge BOTEIN aptly calls them, hired by " only a handful of lawyers ".* The majority of physicians, bound in loyalty by their Hippocratic oath to be sensitive of human afflictions, are cognizant of their oath as witnesses to speak the truth. A few, however, constitute circulated lists of " plaintiffs' physicans ", who convert passing injury into a life vocation, and " insurance company doctors " who are steadfastly blind to all injuries they will not see. So " intolerable " did the abuse of this reckless, if not mendacious, minority become — with resultant " degradation of both professions " — that the Appellate Division instituted an impartial medical panel which can be invoked to determine the validity of sharply differing " expert " testimony upon matters obviously susceptible of substantial approximation.

These melancholy aspects do not complete the picture. In our natural solicitude for our profession and its right practice, we sometimes forget the obvious — that of prime concern are the litigants. The ironic result of our blind spot is that, as much

---

* See Judge BOTEIN's address: " The Role of the Physician as an Expert Witness in Civil Actions " — (N. Y. L. J., April 8, 1955, p. 4, cols. 1–4).

as we deprecate "ambulance chasing" and as stringent as are the measures which we take to eliminate the offense, we ignore the quarry itself once it has been caught; we leave the hapless client to the mercy of lawyer and adversary alike. If solicitation is unethical, exploitation of the client is immoral.

Bona fide but necessitous claimants are open to exploitation by the overzealous, if not unscrupulous, insurance adjuster who does not hesitate to remind them that "the lawyer will get half". Settlement, then, instead of being the result of a balance of interests and equities, becomes a weapon in a war of ultimatum and attrition between adversaries not equally equipped.

On the other hand, awards are often inflated out of proportion to the injuries suffered. Juries who know the facts of life — again "the lawyer will get half" — compensate beyond what they know to be proper. Motivated by a sense of rough justice and an unconscious identification with the handicapped plaintiff, they willfully increase the amount of their verdicts. The Appellate Courts, faced with a spate of immoderate awards, try to redress the condition of imbalance by reducing the verdict — neither their function nor a sound remedy for the unrealistic condition that prevails; and there is thus engendered an "Alice in Wonderland" impasse of running twice as fast to stay in one place! Such incongruity is further compounded when insurance companies raise their premiums to meet ever-increasing verdicts — an increase which is passed on in this fashion to the insured, who some day may be suing plaintiffs.

The practice of contingent fees in accident cases has become so grave an evil, the proposal to have them fixed by the court is not as drastic as it might seem. The fixing of attorneys' fees is already provided in certain areas dealing with compensation * — government contracts and the like. And businesses, too, burdened with a public interest — railroads and other public utilities, residential and other rental space, the dairy industry, and even theatre tickets — are subject to financial regulation for the common good. When necessary, why not the financial arrangements between attorney and client? Such regulation is peculiarly appropriate because of the unusual incidents tradi-

---

* "With power to fix and approve fees for legal services, the rules of the Workmen's Compensation Board provide for approval of fees in an amount commensurate with the services rendered, having due regard for the financial status of the claimant. In practice, fees rarely exceed 10 per cent of an award, and the overall average is estimated not to exceed 5 per cent." (Circular of Legislative Reporter, New York State Bar Assn., N. Y. L. J., Apr. 4, 1955, p. 4, col. 2).

tionally attached to that relationship. Immemorially, from a period dating back to Henry IV,* it has been regarded as one of trust giving rise to special rules and results not attendant upon ordinary dealings.

Holding the status of a fiduciary, the standard of behavior expected of an attorney, then, is "the punctilio of an honor most sensitive", for surely such trust relationship cannot be less instinct with obligation of fair dealing than that of coadventurers! It must follow, further, borrowing from Chief Judge CARDOZO's strictures in the *Meinhard* case (249 N. Y. 458, 464, 468), that the financial equation established with the client is to be judged by standards stricter than the morals of the market place; and enforced by judicial sanction, established by rule (supported by statute if required) to assure the exercise of good conscience.

It had been hoped that the legal profession would heed voluntarily the compelling equities of the situation. In 1950, in *Buckley* v. *Surface Transp. Corp.* (277 App. Div. 224), the First Department registered vigorous disapproval of the present practice and said (p. 226): "We have taken the occasion to express our views with the hope that the members of the bar will of their own volition and in co-operation revise the retainer practice to establish more equitable contingent fee arrangements." It was this unanimous sentiment of our Appellate Division that prompted the Bar Association study in 1952, which finally recommended a contingent fee of 35% net to the client. It should be noted, however, that the abuse inherent in the present practice of an arbitrary fee is not only one of degree but one of kind as well. Any such fixed percentage by its nature bears within itself the seeds of improbity. In the problem of the just compensation of the attorney, the sole criterion of the value of the injury may not be substituted for the obvious operative factors — the services rendered and the other classic desiderata.

How can it be right or sound? We have been instructed by the cases, meticulously and sometimes sharply, that in measuring

---

* In the reign of Henry IV in 1402, Parliament passed a statute which provided, among other things, that by reason of "sundry damages and mischiefs that have ensued before this time to divers persons of the realm by a great number of attorneys ignorant and not learned in the law as they were wont to be before this time", it was established by law "that all attorneys be examined before justices and by their discretion put on the roll and that they that be good and virtuous and of good fame shall be received well and truly to serve their offices."

their value in actions for legal services rendered, the trier of the facts, court or jury, must be mindful and take account of certain variables: the character and importance of the claim, the nature and extent of the services — including difficulties encountered and time consumed — the professional skill and experience of counsel and the responsibilities imposed on him, the results accomplished, *and the pecuniary ability of the client!* All these vital elements are disregarded in a contingent fee arrangement and, generally speaking, those least able to pay are taxed the most. Allowing for a certain premium because of the contingent element, and it is just to do so, how can we, in good conscience, continue to suffer a complete disregard of every controlling consideration which normally obtains? Finally: in the suggestion that the contingent fee be fixed at no greater than 35%, we avoid the issue — we do not resolve it. We license a maximum; inevitably, through the erosion of time and circumstance it will become the minimum. The point is that not only 50%, but any *arbitrary* amount approximating it, is exorbitant and inequitable. The attorney either earns such a fee or he does not. If he does not, he should not get it. If he does, the price of justice becomes too high and is prohibitive in a democratic community; it alienates the citizen from the courts which are the basis of his society under law.

Apart from the consideration that it does not impose any affirmative sanctions, the proposed rule upon which hearings have been ordered by the Appellate Divisions of the First and Second Departments (N. Y. L. J., April 1, 1955, p. 1, col. 3) is open to these same objections. And for the additional one that it is impracticable and self-defeating. It does not proscribe (it denounces as "unprofessional" but does not forbid) a 50% contingent fee when "unusual circumstances" exist. That, however, cannot be made to appear until *after* the claim has been fully liquidated by settlement or judgment and, indeed, the rule requires a filing of a statement of such circumstances only at that time: But it must be remembered that the retainer fee is established at the initiation of a claim; to be able to claim a 50% fee the attorney has to have his client agree at the *commencement* of the relationship; otherwise he could not charge it afterward. At the outset, the attorney cannot determine what unusual circumstances may arise to warrant a greater fee than usual. The inevitable result, therefore, will be that most retainers, as at present, will continue to specify a 50% contingent fee in the expectation of justifying it afterwards.

And who will determine, and how and when, whether there were "unusual circumstances"? The fundamental infirmity of vice of the proposed rule now becomes manifest.

The rule seems to be lacking in force or directed in the wrong direction. Unless it means more than it expresses, it would result only in multiplying the filing of documents — the result of the present rule. If, however, the use of the word "unprofessional" implies punitive action — when it shall have been found that "unusual circumstances" did not exist — such grave intent should be explicitly and clearly delineated. But then it would give rise to a plethora of disciplinary proceedings; the court and its referees would be occupied determining if "unusual circumstances" had justified a 50% fee. Our proper anxiety to protect litigants should not arm them with a potential of harassing lawyers? If, section 474 of the Judiciary Law notwithstanding, lawyers can be disciplined for exacting a 50% fee — if that is not an unreasonable construction — then it does not preclude a construction which would spell out the word "reasonable" before the word "compensation" in its text; and in that view of the statute, it would be competent for the court to require that all contingent fees be subject to approval of the court (after settlement or judgment) to assure their reasonableness; for practically all plaintiffs in accident cases invite the solicitude of the court as do infants. If the contingent fee can be limited by the indirect means of the proposed rule, it can be controlled more directly. It is better for the court to assess what is reasonable and allow it than to determine what is "unusual" and mete out punishment because it was not. It is kinder to judge the fee rather than the lawyer!

The vested interest in a 50% contingent fee is so ancient, its baleful influence so wide and intrenched — "evil established, disciplined, adroit" * — that we can no longer hope that it will be surrendered voluntarily by individual attorneys. The admonition of our Appellate Court, whose enlightened leadership has effected so many salutary innovations, went unheeded. It is clear that only the compelling force of the positive sanction of a substantive rule of court (if necessary, supported by statute) will effect the desired end. It should be clear, too, that the united and determined effort of our profession itself — organized Bar and Bench — must lend the impetus to such implementation. Thus it will appear that we are able to rise

---

* See address to newly admitted members of the Bar by Judge BASTOW — (N. Y. L. J., March 17, 1955, p. 1, cols. 3–4).

above instinctual adherence to outworn mores and shibboleths; and we shall elevate our high calling to renewed esteem in the eyes of the community. Acceptance of the yoke of public obligation will be not an act of submission but one of honorable abnegation!

Judgment for plaintiff as indicated. This constitutes the decision of the court. Settle judgment.