Raymond SPECTOR, Plaintiff,

v.

Milton E. MERMELSTEIN, Defendant.

No. 64 Civ. 3255.

United States District Court,
S. D. New York.

June 30, 1972.

On Motion to Vacate Dec. 18, 1972.

Royall, Koegel & Wells, by Stuart A. Jackson, New York City, for plaintiff.

Joseph Lotterman, New York City, for defendant.

Milton E. Mermelstein, pro se.

LUMBARD, Circuit Judge:*

Raymond Spector, of New York, commenced this suit in 1964 against his

* Sitting by designation.

former attorney, Milton E. Mermelstein, a citizen of New Jersey, alleging breach of Mermelstein's fiduciary duties to him and negligence in acting as his attorney in connection with two loans totalling $250,000 which Spector made in March and May 1962 to OCM Corporation, which owned a gambling casino in Reno, Nevada, and a loan of $35,000 which Spector made in April 1962 to Rex Sierra Gold Corporation, which owned a California gold mine. Spector was never repaid these loans and he seeks to recover the amounts advanced, with interest.

Trial was had before the court without a jury beginning March 13, 1972, and continuing for a total of fifteen days. For reasons detailed below I find the plaintiff's claims are supported as to the Nevada loans, but not as to the Rex Sierra matter.

Spector and Mermelstein have known one another since 1947. Spector was then a successful advertising man with his own agency. In 1950 disagreements among the stockholders of one of his clients, the Hazel Bishop Corporation, in which Spector was a minority stockholder, led Spector to call upon his attorneys, Gordon, Brady, Caffrey and Keller, with whom Mermelstein was associated, to resolve the difficulties. When matters were settled Spector was the majority stockholder, president and chairman of the board of Hazel Bishop, Gordon was a director and Mermelstein was the company's secretary. Spector thenceforth devoted most of his time to running Hazel Bishop, to which the Gordon, Brady firm became general counsel. This relationship continued until 1955 when it was terminated due to Spector's displeasure over the sale of Hazel Bishop stock by various members of the Gordon, Brady firm, including Mermelstein.

For the next six years virtually no communication passed between the parties, but in the spring of 1961 a rapprochement was effected. By that time Mermelstein was about to leave the Gordon, Brady firm. Spector was no longer an officer of Hazel Bishop, but still served as a consultant and board member. When another stockholder dispute took place Spector again enlisted Mermelstein's aid. Mermelstein helped Spector regain control and himself became a director and secretary of Hazel Bishop.

In the fall of 1961 Mermelstein represented Spector personally in the merger negotiations, consummated in January 1962, between Hazel Bishop and the Lanolin Plus Company. Spector had purchased some $100,000 worth of Lanolin Plus securities, which Mermelstein advised him to sell before he became an officer of the company to be formed as a result of the merger. Spector sold the stock to Mrs. Mermelstein for $25,000 and guaranteed her against loss for one year. In return the Mermelsteins guaranteed Spector one half of any profits realized from a rise in the securities' worth. At another time in 1961 Spector loaned $20,000 to the wife of a friend of the Mermelsteins. These transactions are mentioned to illustrate the nature of the Spector-Mermelstein relationship. In December 1961 Spector wrote to Mermelstein praising his ability and dedication and noting that "words cannot express how thrilled I am that during the past year we have resumed an association that should never have been disturbed."

### I. The OCM–RCC Loans

On Sunday, March 4, 1962 Mermelstein attended a meeting with William Miller, the operating head and principal owner of OCM Corporation and the Riverside Casino Corporation (RCC) in Reno, Nevada, and William Ehrens, Miller's accountant. OCM and RCC were financially unhealthy, and Miller and Ehrens were in New York seeking a remedy in dollars. They met with Mermelstein to discuss merger possibilities between OCM and a corporate client of Mermelstein's. Mermelstein testified that he rejected the proposed merger because his client needed cash, which OCM and RCC could not generate because all

of the casino's income was required by OCM to meet its monthly mortgage payments of $37,500. Mermelstein also testified that he learned at the meeting that OCM had a deficit due to these large monthly payments, and that OCM was left "in a continuous loss situation."

Miller told Mermelstein that on behalf of OCM he had borrowed $154,000 in Reno from a Mr. Crummer, a former owner of the casino. As security for this loan Miller had deposited with William Bradley, Crummer's nephew and attorney, the deed and a bill of sale for the property and the casino hotel, and a cancellation of the lease between OCM and RCC. Under Nevada law, a default on the loan would have enabled Crummer forthwith to record the deed and bill of sale without foreclosure proceedings or other ado. Miller said that the loan was due within the week, and that he could not pay it.

At Mermelstein's suggestion, Miller and Ehrens called on Spector on March 6, 1962. They told Spector that Miller had purchased the property and the casino a year or two earlier for five million dollars, and had subsequently paid about $1,200,000 against the total mortgage.[1] Although the casino had made money during the summer of 1961, an unusually severe winter and operating errors combined to injure RCC's, and thus OCM's, position. They explained that they needed $154,000 to pay off Crummer and keep the property and casino. No one told Spector, however, that Mermelstein had met with Miller and Ehrens on the fourth, or that all of the casino's income was consumed by OCM's mortgage obligations.

Spector and Mermelstein give widely differing accounts of what happened on March 6. According to Spector, Mermelstein telephoned him to tout the investment opportunity and, despite Spector's reluctance, arranged the meeting, brought Miller and Ehrens to Spector's office, and pushed hard for Spector to make the loan. Mermelstein, on the other hand, recalls that he simply relayed Miller's request to Spector, who leapt eagerly for the "deal," and that, when he arrived at Spector's office some time after Miller and Ehrens had arrived, Spector presented him with a fait accompli, adamant in his enthusiasm despite Mermelstein's urgent advice not to go through with it. According to Spector, he wanted Miller personally to guarantee the loan he requested from Spector, as he had Crummer's, but Mermelstein said that it was unnecessary because the equity in the property was $1,200,000 and Spector's protection was ample. According to Mermelstein, he urged Spector to insist on Miller's personal guarantee, but Spector said it was superfluous.

Spector did agree on March 6 to make the loan of $154,000 to repay Crummer. Miller also requested, and Spector agreed to loan, an additional $46,000 to renovate the hotel restaurant, rounding the loan to $200,000. In return Spector was to assume Crummer's position, without the personal guarantee of Miller but with the added sweetener of 10% of OCM's stock and 10% of RCC's stock. For arranging the loan Mermelstein was to receive 2% of OCM's stock.[1a] The transaction was to be effected immediately. Time was short; the Crummer

---

1. Although it was not disputed at trial that the mortgage was $5 million and that about $1,200,000 had been paid down, the record does not show how Miller did this, and it is not clear what, if any, equity there was in the property. At his deposition Miller was challenged on this point, and as much as conceded that perhaps only $600,000 had been paid off.

1a. There is some confusion as to exactly how much stock Spector and Mermelstein

were to receive. Mermelstein testified that as of March 6 he did not know he was to receive any stock whatsoever. Spector testified that he told Mermelstein on the 6th that he would receive 2%. By deposition Miller, who is presently bringing an action against Spector and who was obviously friendly to Mermelstein supports Spector's testimony. See also note 4.

loan was coming due within several days. From Spector's office Mermelstein telephoned the attorney Bradley in Reno to ask if he could secure an extension on the loan from Crummer, and if he would act, as he did for Crummer, as Spector's escrow agent for the deed, bill of sale, and lease cancellation. Bradley agreed.

The following day, March 7, Spector executed on his letterhead a power of attorney to Mermelstein, and another on a printed form of the Bankers Trust Company. Spector did not actually send his own money to Reno. Instead he arranged for Bankers Trust Company to loan the $200,000 against OCM's note which Spector endorsed and collateralized with his personal bankbooks. On March 7 Spector also wrote a letter to the bank advising that Mermelstein had his power of attorney, that the bank should loan $200,000 to OCM against Spector's guarantee and bankbooks, and that the money should be transmitted to the bank's correspondent bank in Reno, $154,000 to be paid "to the person designated by Mr. Mermelstein" and $46,000 to OCM. The loan was to be repaid in July, August, September and October installments of $50,000 each.

Mermelstein, despite his denial, probably had some hand in the preparation of these March 7 documents, although he was in Washington, D. C. on the seventh and not, as Spector had remembered, in Spector's office. Whether the authorship was primarily, or in part, Mermelstein's is unimportant; the fact is that he was acting and continued to act as Spector's attorney in this matter. Yet he had not advised Spector that all the income from RCC went for OCM mortgage payments, leaving no residue to re-

pay Spector's loan, and that OCM was operating at a continual deficit, even though, as Mermelstein testified, he knew this as a result of his March 4 meeting with Miller and Ehrens.

When Mermelstein got to his office on March 8, after returning from Washington, D. C., he saw the Spector documents of March 7 and a telegram that had arrived at his office on the seventh from Bradley in Reno. The telegram read:

CRUMMER BY LETTER TO MILLER DATED MAR 1 1962 EXTENDED MILLER PAYMENT OF 90,000 UNTIL MAR 15 1962 CRUMMER HAS NO OBJECTION TO MY REPRESENTING [sic] OF YOUR PEOPLE   WM O BRADLEY 1 1962 90,000 15 1962

Miller had not said that Crummer had already given him an extension to March 15, or that only $90,000 was then due.[2] Rather, he had told both Mermelstein and Spector that the Spector loan had to be consummated immediately because the Crummer loan of $154,000 was coming due within the week. Yet, by his own testimony, Mermelstein admitted that he neither told Spector of this telegram from Bradley nor inquired further as to these inconsistencies.

A letter agreement between Spector and Miller on behalf of OCM, setting forth the agreement between the parties, was dated March 8 and apparently not seen by Spector, who had gone to Florida the evening of the seventh,[3] until the end of the month when Mermelstein gave him a batch of papers regarding the transaction. Mermelstein on the eighth made a number of changes on the first page of this letter agreement and sent the revision out to Reno for Miller's signature. Also dated the eighth were

---

2. At one point in his testimony Mermelstein indicated that when he called Bradley on March 6 he learned that $90,000 was due "within the week." In subsequent testimony he said that $90,000 was never mentioned on March 6.

3. Spector's trip to Florida, where he had a houseboat, was planned sometime be-

fore he agreed to meet with Miller and Ehrens on the sixth. Mermelstein was aware of these plans. Spector's departure explains why he gave Mermelstein his power of attorney on the seventh. He did not return to New York until March 13 or 14.

two additional letters from Miller to Spector, one agreeing that Spector should have 12% of OCM's outstanding stock and the other agreeing to sell him 12% of RCC's outstanding stock.[4] The language of these letters indicates that Mermelstein was involved in their creation, as neither Spector nor Miller is an attorney, and Spector by then was in Florida.

On March 9, Friday, the Bankers Trust Company wired the First National Bank of Nevada that it would send $200,000 the following Monday, March 12, with definite instructions to accompany the transfer.

On Saturday, March 10, Mermelstein wrote three letters. One instructed and authorized the Bankers Trust Company to send the $200,000 to the First National Bank of Nevada with instructions to disburse the money through Bradley to the Beverly Hills Development Corporation (Crummer's company) and OCM.[5] The Reno bank was not to release the funds until Bradley had advised it that he, as Spector's agent, held in escrow the deed, bill of sale, and lease cancellation, and that he had cancelled the OCM note to Crummer and destroyed the papers held in escrow for Crummer.

The second letter written by Mermelstein on the tenth went to Bradley in Reno. He advised Bradley that the money would be sent out on the twelfth, as the Bankers Trust Company on the ninth had advised the First National Bank of Nevada.

Mermelstein sent the third March 10 letter to Miller. Here again Mermelstein noted that the money was going out to Reno on Monday the 12th. He did not mention the telegram he had received from Bradley with information inconsistent with Miller's representations both as to the amount of the Crummer note and its due date.[6]

On Sunday, March 11, Mermelstein attended another meeting involving possible financing for OCM. Spector was still in Florida. Miller was in Reno. Mermelstein went at the insistent urging of Ehrens, Miller's accountant, who had telephoned him no less than four times on Friday to try to arrange the meeting at a time convenient to Mermelstein. He testified that he had no notion why he was urged to attend until he got to the meeting and was told by Ehrens that another merger involving OCM was under discussion, and that it was important that he be there because Spector would surely ask about the merger and it would somehow "save time" if Mermelstein knew of it in advance.

Apparently the prime mover behind the March 11 meeting was Richard Terker, then president of Terry Industries, Inc., a construction company in desperate financial condition. A Terry prospectus of October 17, 1961 pointed out that the company had been unprofitable for the preceding four years, had an earned surplus deficit of over three million dollars, and current liabilities over a million dollars in excess of current as-

4. The 12% figure for Spector may have been an oversight if the intention was to give Spector 10% and Mermelstein 2%. When Spector loaned an additional $50,-000, see *infra*, Mermelstein wired Bradley that as consideration for this loan Spector was to get two additional shares and Mermelstein himself three. By this arrangement it appears that Mermelstein thus received 1% for his role in the $50,-000 loan, and 2% for the original loan of $200,000.

5. By this letter, naming the Beverly Hills Development Corp., Mermelstein designated the ultimate recipient of the $154,-

000, as Spector's letter of March 7 to the bank had said he would. Without this desigation the bank would not have known to whom the money should be sent.

6. Mermelstein testified that he also telephoned Bradley on Friday, the 9th, to assure him that the money was coming so that Crummer would not record the deed held as collateral on his loan. Yet Mermelstein had been advised the day before by Bradley's telegram to him that Crummer had given an extension to March 15. Mermelstein testified that he did not discuss the telegram with Bradley when he called him on the 9th.

sets. The prospectus covered an offering of over 550,000 shares of Terry common stock; only some 40,000 had been sold.[7]

The March 11 meeting, held at Ehrens' office in the Empire State Building, was attended by Ehrens, Terker, Mermelstein, Benjamin Dranow, Joseph Patrick and Fred Schoeffer. Schoeffer, a finder and arranger of financial deals, was a consultant to Terry. At his instigation Patrick came to the meeting. Patrick had recently become a partner in the investment banking firm of David Baird & Co. Dranow at that time was apparently affiliated in some way with the Teamsters Union. His precise interest in the Riverside Casino has not been made clear throughout the trial, but eventually he was instrumental in securing a mortgage loan for the property from the Teamsters Central States, Southeast and Southwest Areas Pension Fund (Teamsters Pension Fund).

Terker's plan was this: Terry was about to file an amended prospectus to the one then pending. In that prospectus it was essential to include a statement to the effect that Terry had signed a letter of intent to merge with another corporation so that a major Terry creditor might give the company a respite. A merger with OCM would benefit both companies because OCM offered depreciation and Terry replied with a huge tax loss carry forward to balance any income from the casino. Of course, after OCM's mortgage payments the casino's income was exhausted. Some sort of refinancing of OCM was needed.

The testimony of Patrick and Schoeffer establishes that the participants at the meeting discussed the possibility that Patrick would provide some $1,750,000 in interim financing for OCM, and that Dranow would then procure four to five million dollars in permanent refinancing with the aid of a mortgage loan from the Teamsters Pension Fund. Both Mermelstein and Dranow participated actively in the discussions, and Teamster financing was a major topic. Mermelstein testified that although this was the second meeting he had attended with Dranow, he was never introduced to Dranow and did not know who he was or why he was present.[8] Mermelstein also testified that he arrived late at the March 11 meeting and therefore was not present when Teamster financing was discussed. I do not credit Mermelstein's account, which was contradicted in relevant part by the testimony of both Patrick and Schoeffer.

Terker had brought to the meeting a draft prepared by his attorney of a Terry-OCM letter of intent to merge. This Mermelstein found wholly inadequate, and he stayed late into the night to help prepare an instrument more fit to the purpose. The following day during a recess in Surrogate's Court in Brooklyn Mermelstein received and reviewed a typed version of the final draft prepared the night before.[9]

I credit Spector's testimony that Mermelstein never told him about the meeting or about Terry and Dranow, despite Mermelstein's testimony that he told him of the proposed merger in the next day or so. Mermelstein testified that Spector said he hoped the merger would not go through because Spector was interested in his participation in the casino under the terms of his loan to OCM. But, according to Mermelstein's own testimony, if the proposed merger had been effected Spector would have recovered his $200,000, received stock of the new

---

7. Mermelstein testified that he had not known Terker prior to this meeting, but that he had seen a copy of the Terry prospectus sometime in late 1961.

8. Mermelstein testified that Dranow had also attended the meeting on March 4 with Miller, Ehrens and another of Mermelstein's clients, but was not introduced and merely sat on a balcony eating a sandwich, apart from the others.

9. At this time Mermelstein added to the draft letter of intent the only language which would have directly protected Spector's $200,000 loan to OCM had the merger been effected.

company worth some $192,000, and retained his interest in the casino as well.

In light of the need for $1,750,000 in interim financing for OCM, which Mermelstein learned of at the meeting, he must have known that Spector's loan of $200,000 was nothing more than a miniscule stopgap and a very risky one. Mermelstein's duty was to acquaint Spector with his knowledge immediately. Instead he told Spector nothing. Yet he did telephone Miller from the meeting. He testified that Miller explained that the Terry deal had been discussed before the Spector loan had arisen, and that he was no longer interested in the merger because he preferred the arrangement with Spector.

Mermelstein having done nothing to alert Spector, nor having made any attempt to delay the disbursement of the money, on Monday, March 12, the $200,000 went out to Reno and was disbursed through Bradley to the Beverly Hills Development Corp. ($154,000) and OCM ($46,000). Also on that date Bradley wrote two letters to Mermelstein, received by him on the 14th.

The first letter described the completion of the transfer as described above, and enclosed copies of the deed, bill of sale, and lease cancellation, as well as a stock certificate issued in favor of Spector for 12 shares of OCM.

The second letter discussed legal aspects of the loan under Nevada law in response to questions put by Mermelstein in his telephone call to Bradley on March 9 and his letter to him of March 10. Bradley also wrote, "Of course, you realize these documents [the deed, bill of sale, and lease cancellation] are not to be recorded and we have to rely on Miller's good faith in not conveying any of the properties during the interim of this contract which is the same thing that Mr. Crummer had to do." The foundation of Spector's security for his loan was his ability to take the property and casino immediately upon OCM's default. That all this rested merely upon Miller's good faith in refraining from selling the property was not within Spector's knowledge. Whether or not Mermelstein knew this before he received this letter is unclear; in any event, he did not show Bradley's letter to Spector.

On March 31 Mermelstein delivered to Spector some, but not all, of the papers pertinent to the loan transaction. Included were the March 8 letter agreement, describing the entire transaction, from OCM to Spector; the two March 8 letters from OCM to Spector agreeing to sell 12% of OCM and 12% of RCC; a March 12 letter, drafted by Mermelstein but signed by Miller, authorizing the Bankers Trust Company to release Spector's collateral upon repayment of the OCM note; copies of the deed, bill of sale, and lease cancellation; a copy of the OCM note to the Bankers Trust Company, endorsed by Spector; a copy of Mermelstein's March 10 letter of instructions to Bradley; the stock certificate for 12 shares of OCM in Spector's name; and a copy of a March 12 letter from OCM to Bradley concerning the escrow arrangement.

Mermelstein took these papers to Spector's office. In his own hand on a sheet of yellow paper Mermelstein listed the documents delivered and had Spector sign the paper as a receipt. The Bradley telegram of March 7 advising of the already granted extension was not included. Neither was the March 10 letter to Miller from Mermelstein, nor the March 12 letter from Bradley telling of the reliance on Miller's good faith. These excluded documents were not seen by or described to Spector until after this litigation was under way.[10]

Late in April, Miller telephoned Spector and asked for an additional loan of $50,000, saying that business exigencies had precluded use of the $46,000 for restaurant construction as planned. Mer-

---

10. I do not credit Mermelstein's testimony that he brought these excluded documents along with the others to Spector's office but kept them at the insistence of Spector.

melstein called Bradley, and then wired him on May 1, that Spector was lending another $50,000 to enjoy the same status as the first loan of $200,000 [11] and that as consideration Spector was to receive two additional shares of OCM and Mermelstein three (one in connection with this later loan and two for his role regarding the earlier).[12] The $50,000 was transferred on May 2.

This $50,000 was to be released by Bradley against contractor's bills, but within several days Miller called and asked for $25,000 of it to meet more pressing operating expenses. Spector's contention that Mermelstein rather than he favored release is supported by the fact that Mermelstein on May 4 wired Bradley the instructions to give Miller the $25,000.

Within a day or so Spector himself went to Reno at Miller's invitation. At Miller's request Spector authorized the release of the second $25,000 following a call to Mermelstein, who advised Spector that he would have to decide himself whether or not to release it.

Spector does not charge Mermelstein with any losses suffered beyond this $250,000. A mass of evidence regarding transactions subsequent to the second loan in early May was introduced to demonstrate that when Spector finally extricated himself from Reno he had sustained losses greatly exceeding $250,000. The proof, cancelled checks, bank statements and other financial documents, establishes beyond peradventure that Spector indeed lost more than the amount in damages he seeks from Mermelstein. Thus these later events need be recounted only in outline.

On May 10 Spector loaned OCM another $200,000, bringing his total outlay to $450,000. By this time Spector, with Miller's consent, had sent one Frederick Wageman to Reno to help with the accounting and bookkeeping.[13] When Wageman reported that Miller was not using the latest loan to pay off creditors at the casino, Spector finally decided he had had enough and asked Miller to repay immediately, in installments if necessary. Miller responded that he could pay nothing. Spector could not seize the property by recording the deed because the first OCM loan of $200,000 was not due until October.[14] Spector testified that he then asked Mermelstein for help, and that Mermelstein told him to see Ehrens and Dranow, who had a "plan" for Spector. Mermelstein testified that Spector approached Dranow on his own. The conflict is unimportant: whatever the impetus, Spector and Dranow got together. .

The three outstanding mortgages on the property totalled some 3.8 million dollars. Their plan was that with Dranow's help the Teamster's Pension Fund would provide $2,750,000 with which to purchase these mortgages at a discount and to pay off certain other accrued indebtedness. The monthly mortgage payments could thereby be reduced from $37,500 to about $20,000. For his part in securing this mortgage Dranow would receive an "advisor's" commission.

Miller's personal credit, however, was inadequate to secure the Teamster mortgage. He would have to go. Spector returned to Reno about June 5, Mermelstein arrived two days later, and on June 11th agreement was reached whereby Spector replaced Miller as the

---

11. The Bankers Trust Company was not involved in this loan: Spector sent out his own $50,000.

12. See note 4.

13. Wageman got to Reno on May 2 or 3. Thereafter he had complete access to the casino's financial documents, and was a co-signatory on the casino's checks. Thus from the time Wageman went out to Reno Spector either knew or was in a position to know as much about the casino's financial condition as was necessary for him to act on his own, and reliance on Mermelstein for Spector's subsequent actions is not alleged.

14. When Spector loaned the additional $50,000 to OCM on May 2 he also extended the due date on the prior $200,000 loan, as a result of which OCM apparently was not obliged to make any payments until October.

owner of the property and the casino. Apparently Spector's hope was to sell the property for 5 million dollars once he had reduced the total mortgage and carrying charges with the help of the Teamster money.

On June 15 Spector made his presentation to the Teamsters in Chicago. Ehrens and Dranow accompanied and coached him. The trustees of the Teamsters Pension Fund advised him the loan would be forthcoming, but it was not until October 15 that the closing took place.

In November Spector conveyed the property and the casino to Raymor, Inc., a corporation organized in the name of Spector's wife but of which he was president. Contrary to Mermelstein's advice but in accord with Bradley's opinion, Spector had assumed the prior indebtedness of the casino when he took over on June 11. Even with the new financing the casino remained in financial straits, and the organization of and conveyance to Raymor was apparently prompted by Spector's desire to relieve himself of personal liability.

The scheme failed. In late December the casino went into bankruptcy, and the bankruptcy court found Raymor Inc. the alter-ego of both Spector and his wife. Also in that month, after unsuccessful negotiations in November between Spector and another of Mermelstein's clients, Raymor and the Hughes-Porter Corporation entered into an option agreement to purchase the property and casino. Ultimately the option was taken up, and Spector put Reno and a considerable amount of money behind him.

Spector charges that Mermelstein was negligent and breached his fiduciary duty as Spector's attorney by not making further inquiry upon the discovery of discrepancies in Miller's representations and by not sharing with Spector his full knowledge of the transaction and participants in question. It is agreed that New York law governs. In New York, as in virtually all jurisdictions, "An attorney is commissioned by the court to hold himself out to the world as competent and trustworthy. The public has a right to assume he has the necessary legal knowledge to represent his clients and the integrity which will protect them from all fraud and wrongdoing on his part. He must keep his clients informed as to the state of their business and be open and frank with them. He must not suppress the truth from them." In re Clay, 256 A.D. 528, 11 N.Y.S.2d 96, 100 (1939), rev'd on other grounds, 282 N.Y. 140, 25 N.E. 2d 961 (1940).[15]

Mermelstein knew a great deal about OCM's weak financial position by virtue of his March 4 meeting with Miller, Ehrens and one of his own clients.[16] He certainly knew enough to disdain a proposed merger between his client's company and OCM, which had no cash once it applied all of the casino's income towards the mortgages and was operating at a deficit. Yet he never told Spector of this meeting or that OCM was obliged to make payments of $37,500 per month.

15. *See also*, as to the attorney's duty to his client, often described as a fiduciary's duty, Kelly v. Greason, 23 N.Y.2d 368, 296 N.Y.S.2d 937, 943 (1968); Farr v. Newman, 18 A.D.2d 54, 238 N.Y.S.2d 204 (1963), aff'd 14 N.Y.2d 183, 250 N.Y.S. 2d 272 (1964); Galante v. Dahlstrom, 21 Misc.2d 681, 197 N.Y.S.2d 361 (1959); Lehman v. Cameron, 207 Misc. 919, 139 N.Y.S.2d 812, 822 (1955); In re Vaupel's Estate, 37 N.Y.S.2d 853 (Surr.Ct.1942), aff'd 266 A.D. 723, 40 N.Y.S.2d 956 (1943), app. den. 266 A.D. 776, 42 N.Y.S. 2d 921 (1943); Krohe v. Goldman, 167 Misc. 930, 4 N.Y.S.2d 851 (1938); ABA Canons of Professional Ethics, adopted by New York State Bar Association in 1909, Judiciary Law (Appendix), McKinney's Consol.Laws vol. 29, replaced by ABA Code of Professional Responsibility, adopted by New York State Bar Association, January 1, 1970, Judiciary Law, Supplement.

16. Marmelstein's testimony that there was no discussion on March 4 of the financial condition of the casino, other than its monthly payments of $37,500 to OCM which OCM paid against the mortgage, is contradicted by Miller's deposition testimony.

Upon receipt of the knowledge, gained from Bradley's telegram of March 7, that Crummer had already extended the OCM loan in the amount of $90,000 rather than $154,000, Mermelstein's obligation as Spector's attorney was twofold. He should have advised Spector, and he should himself have made further inquiry as to the discrepancies. Miller had said that the loan had to be effected immediately—within the week—so that Crummer would not take over the property, and on the night of the 6th Mermelstein had called Bradley to ask if Crummer would grant a few days' extension. Why Miller had not told the truth about the due date, why he had not said that only $90,000 was due, and what if any other parts of his story were inaccurate, were questions Mermelstein should have pursued in order to protect Spector.[17]

Then, on March 11th, Mermelstein attended the meeting with Terker, Dranow, Ehrens, Patrick and Schoeffer. Mermelstein left this meeting with full awareness of the financial weakness of OCM as it contemplated merger with a company so debt-ridden and dog-eared as Terry. The mere fact that OCM needed about $1,750,000 as a prelude to permanent financing put Mermelstein on notice that Spector's $200,000 was a mere stopgap and might well be lost unless substantial permanent financing was soon made available.

By the night of March 11th the $200,000 had not yet been transmitted to Reno. Mermelstein testified that he thought it had gone out some time earlier, and thus he was powerless to stop the loan regardless of what he learned at that meeting. His own letters, however, to Miller and to Bradley, advised that the money would be sent on the 12th, as the Bankers Trust Company had advised the First National Bank of Nevada. Mermelstein also testified that the OCM letter agreement of March 8 to Spector, combined with Spector's letter of that date to the Bankers Trust Company and the OCM note to the Bankers Trust Company, constituted a "binding contract," apparently between the bank and OCM, to lend the money, and this, too, rendered Mermelstein powerless. Finally Mermelstein testified that had he done anything to interfere with the loan he would have subjected Spector to possible liability for breach of contract with Miller, and himself to liability to Spector for second-guessing and overreaching his client.

I do not credit any of the explanations which Mermelstein offers for his failure to advise Spector fully and to delay the transfer of the money to Reno.

Mermelstein knew full well that the money would not be sent until the 12th. He was under a duty to inform Spector immediately about OCM's merger negotiations with Terry and OCM's financial instability as evidenced by its need for $1,750,000 in interim financing alone. Furthermore, there could be no valid contract to make a loan if Spector had been misled as to the financial condition of OCM. I do not credit Mermelstein's testimony that he remained silent for fear of subjecting Spector or himself to liability. Even if such fear existed, it did not preclude Mermelstein from contacting Spector, informing and advising him. Spector had a right to the information, and to decide for himself what to do and what risks, if any, to run if he chose not to make the loan.

■■ A client is entitled to all the information helpful to his cause within his attorney's command. If an attorney

---

17. Mermelstein's failure to discharge this duty to his client is especially telling in view of insistence at trial that he was opposed to the transaction from the beginning and repeatedly counselled Spector against it. Mermelstein testified that he told Spector not to make the loan because he thought that it was being done too fast, without sufficient time to investigate the financial condition of OCM and RCC. Indeed, Mermelstein testified, he told Spector at one point that he would have nothing to do with the transaction because it was being done so haphazardly. In view of the findings recited in this opinion, and all the surrounding circumstances, this testimony is not credited.

negligently or willfully withholds from his client information material to the client's decision to pursue a given course of action, or to abstain therefrom, then the attorney is liable for the client's losses suffered as a result of action taken without benefit of the undisclosed material facts. Material facts are those which, if known to the client, might well have caused him, acting as a reasonable man, to alter his proposed course of conduct.

■ Mermelstein breached his fiduciary duties to Spector by failing to inform him fully of facts known to him which raised serious questions regarding the advisability of loaning money to OCM and by not inquiring further himself when he became aware of circumstances indicating that his client was not being fully advised. Spector testified that had Mermelstein been fully candid with him he would not have made the loans. It is enough to say that a reasonable man, advised by his attorney that a corporation to which he was contemplating a substantial loan was without sufficient income to repay and otherwise in precarious financial condition, probably would not have made the loan.

Exactly why Mermelstein attended the March 11 meeting, and upon whose behalf, is not satisfactorily explained. Clearly he was not there the better to advise Spector of the details of the proposed merger. Ehrens, who apparently is still available, might well have shed light on the events of March 6 and March 11, and the issues in this case, but he was not called to testify.[18] Terker, at whose request the meeting was arranged, could remember virtually nothing about it. Terker did, on July 31, 1963, write a letter to Spector in which he said that Mermelstein at the meeting "was representing the seller"—that is, OCM. A subsequent six-page letter from Terker to Mermelstein's attorney in this action, dated July 8, 1965, repu-

diated the earlier letter and asserted that Mermelstein attended the meeting as Spector's attorney. I credit this second letter little, as it coincides in perfect detail with earlier deposition testimony of Mermelstein which he later recanted upon factual proof to the contrary.

Mermelstein's telephone call from the meeting to Miller, and his inclusion the following day of the only language in the Terry-OCM letter of intent directly protective of Spector, also indicate that Mermelstein may well have been representing OCM rather than Spector. Conflicting testimony and imperfect recollections of events ten years past make it difficult to determine whom Mermelstein was representing: it is enough that he breached his duty to Spector by concealing from him both the fact and substance of the meeting, and by failing to make further inquiry on Spector's behalf.

Mermelstein has argued that Spector overrode his counsel by deciding to make the initial loans to OCM, and that Spector's subsequent takeover of the property and casino was motivated by Spector's desire to begin a new career as entrepreneur and financier. Mermelstein's breach of duty to Spector, however, embroiled Spector initially with RCC and OCM, and Mermelstein has not come forward with sufficient evidence to show that his breach of duty would not have caused Spector's harm had Spector merely ridden out the storm as a bystander rather than taken over the casino to protect his investment. Indeed, from all that appears, Spector would have lost his money whichever course he chose. When he finally sold the casino to Hughes-Porter the purchase price was $3,300,000—after Spector had reduced the mortgages from about $3,800,000 to less than $2,750,000 and the monthly payments from $37,500 to approximately $20,000. Thus the sale price was $500,000 less than the mortgages on the

---

18. Mermelstein's failure to call Ehrens is all the more surprising in light of Mermelstein's representation of Ehrens in an apparently unrelated matter in 1963 and Ehrens' subsequent accounting work for Mermelstein's law firm. Spector in November 1962 discharged Ehrens as the casino's accountant, and brought suit against him in New York in 1963.

property when Spector loaned the $250,000. There is no evidence to indicate that, had Spector merely waited for the casino to go bankrupt and then taken over on OCM's default, he could have sold the property, heavily burdened with operating deficits in addition to the mortgages, at a price sufficient to recover his $250,000 or any part of it. Mermelstein went out to Reno to meet with Miller and help draw the necessary papers for Spector's takeover. Mermelstein himself knew enough about the situation at that time so that he could have testified at trial how Spector might have recovered some, or all, of the $250,000. In any event, it behooved Mermelstein to come forth with probative evidence to show that Spector could have avoided any loss from the first loans of $250,000. This burden he has not discharged.

## II.   The Rex Sierra Loan

In his fourth cause of action Spector alleges that Mermelstein, acting as his attorney, misrepresented and concealed from him material facts concerning the condition of the Rex Sierra Gold Corporation. As a result, Spector alleges, he was induced to loan $35,000 to Rex Sierra, which he has never recovered. Spector has not established these allegations by a fair preponderance of the evidence.

Spector testified that he first met Philip King, the president of Rex Sierra Gold Corporation, in Mermelstein's office in early April 1962. Mermelstein had acted as Rex Sierra's attorney, and both he and his wife owned stock in the corporation. Spector testified that Mermelstein told him that King was "one of the world's greatest mining engineers" and that the California gold mine owned by the corporation had made millions before hydraulic mining had been outlawed in the state, and was expected to be enormously profitable once again as hydraulic mining had recently been legalized. In the latter part of April, according to Spector, Mermelstein urged him to loan $35,000 to Rex Sierra for water-pumping equipment, in return for which Spector would receive an option on 7500 shares of Rex Sierra stock at $1.00 per share, the shares then selling at $2.00. Spector further testified that Mermelstein told him he would personally guarantee Spector against loss.

On the other hand, Mermelstein testified that Spector and King had met prior to their encounter in Mermelstein's office in April 1962, and that Spector immediately agreed to King's request for a loan, without any participation by Mermelstein whatsoever. He did testify, however, that he himself had previously loaned King money against an option to buy Rex Sierra shares, and that he suggested to Spector that he also take an option. But the agreement papers between Spector and King, according to Mermelstein, were not prepared, but only reviewed and corrected, by him.

Both Spector and Mermelstein agreed that Mermelstein never told Spector that he had represented King in an earlier matter involving the sale of public shares of unregistered stock in connection with another of King's mining ventures. As King's attorney, Mermelstein had signed a consent order obtained by the SEC in 1956 permanently enjoining King from further sales of the unregistered stock. Spector and Mermelstein also agreed that Mermelstein never told Spector of several letters he had seen, written to King from King's mining engineer on the site of the Rex Sierra mine. These letters touted the mine's possibilities, but each promised a new date for the start of operations and called for additional capital. The mine never did operate, and King was subsequently enjoined by the State of New York from selling unregistered shares of Rex Sierra stock.

There is evidence indicating that Spector was interested in investing in Rex Sierra at least in part because he knew that one Mitchell Liftig, a close business acquaintance, had also invested in the mine, and that Spector, upon learning of Liftig's involvement, decided himself to invest. Mermelstein and Spector disagreed at trial about whether Spector knew of Liftig's involvement

prior to making the $35,000 loan, but Spector did not call Liftig to testify.

Most important, however, is Spector's failure to establish by a preponderance of the evidence that Mermelstein caused this loss. Even had Mermelstein told Spector that King had been enjoined in 1956 from selling unregistered stock to the public, this is not the kind of information which necessarily casts doubt upon the advisability of making a loan six years later to a new corporation organized by King. And the letters to King from his mining engineer were so enthusiastic that they probably would have only encouraged one already inclined to invest. Furthermore, Spector has not demonstrated that any favorable representations Mermelstein may have made about the mine's prospects were unwarranted or calculated to mislead him. Spector recommended and paid for a survey of the mine by an independent mining engineer, Hopkins R. Fitzpatrick, whose report of May 22, 1962 concluded that the mine "could well be developed into a profitable gold producer" because it contained "a very large amount of gravel containing significant values that could be mined with a high degree of mechanization." Spector also testified that when he told Liftig that he had invested in the mine, Liftig spoke highly of his own investment and said that he expected the mine to make "millions."

■ In sum, Spector has not persuaded the court either that he relied on any misrepresentations Mermelstein may have made about Rex Sierra, or that Mermelstein withheld from him information material to his decision to make the $35,000 loan.[19]

■ The foregoing shall constitute the court's findings of fact and conclusions of law in accordance with F.R.Civ.

P. 52(a). The Clerk shall enter judgment, pursuant to F.R.Civ.P. 58, that plaintiff recover on the first cause of action $250,000 from defendant, together with costs. As the plaintiff was largely responsible for the delay in bringing this case to trial, and as the record does not show that the defendant realized any profit from his breach of duty, no interest is allowed up to the date of judgment.

The Clerk is further directed to enter judgment for defendant on the fourth cause of action. The third cause of action, relating to the OCM–RCC transaction, was abandoned before trial. The second cause of action, alleging fraud in connection with the OCM–RCC loans, and the fifth cause of action, alleging fraud in connection with the Rex Sierra loan, were not pressed at trial, and the Pre-Trial Order of November 20, 1969, which framed the issues for trial, made no mention of fraud. In any event, there was no proof of fraud, and accordingly the second and fifth causes of action are dismissed.

## ON MOTION TO VACATE

The defendant Mermelstein, proceeding pro se, by motion, filed October 20, 1972, asks that so much of the final judgment entered on July 5, 1972, as granted judgment to the plaintiff Spector in the sum of $250,000, be vacated and set aside on the grounds of newly discovered evidence and fraud, pursuant to Rule 60(b)(2), (3) of the Rules of Civil Procedure.

The court heard oral argument on the motion on November 10, 1972, after Stuart Jackson, counsel for plaintiff, had filed answering affidavits. Thereafter both parties filed additional affidavits, all of which have been considered except so much of Stuart Jackson's affi-

19. In view of this conclusion, it is unnecessary to consider whether Spector had standing to assert this claim. When Rex Sierra defaulted on the loan Spector assigned the Rex Sierra note to his wife, who obtained a judgment but was unable to collect. When Mrs. Spector died in 1967 the judgment became part of her estate, and Spector has argued that it re-verted back to him under her will and that, because it is unsatisfied, he is entitled to sue Mermelstein for breach of fiduciary duty. Alternatively, Spector has argued that suit against Mermelstein is appropriate because the consideration Mrs. Spector paid for the assigned note was actually provided by Spector himself.

davit of November 19, 1972, as makes reference to the case of Fuller v. Dilbert, and Mermelstein's reply thereto, both of which have been disregarded.

The motion is denied.

With his moving papers Mermelstein submitted no statement or affidavit from Joseph Lotterman, an experienced and able lawyer who represented him at trial. At argument of this motion Mermelstein advised the court that he no longer represented him. Subsequently Mermelstein submitted an affidavit of Lotterman, sworn to November 9, 1972. This affidavit fails to support, either by general statement, or in any single detail, Mermelstein's claim that the evidence he now seeks to have considered is in fact or in law newly discovered or indicative of fraud; he states only that his attorney-client relationship with Mermelstein had ceased; and that had Mermelstein requested him to appear on this motion, he would have willingly appeared upon such motion which he believes to be "meritorious."

All the items of evidence claimed to be newly discovered were either available to Mermelstein before trial or could with reasonable diligence have been discovered before trial or, at latest, could have been developed during trial. Moreover, the court is not persuaded that any of the alleged evidence, or all of it taken together, even if it had been produced, could have led to a different judgment on the first cause of action.

There are seven separate items of evidence which defendant thinks merit reconsideration on the first cause of action.

1. *Internal Revenue Service Action on Spector's 1962 Tax Return*

Defendant claims recently acquired knowledge of a January 1972 stipulation of settlement of IRS claims of a tax deficiency against Spector relating to his 1962 individual tax return, which charged Spector with a "profit" of $121,000 on the sale of the Riverside Hotel property. Mermelstein asserts that information in IRS files which he says first came to his attention in July 1972, leads him to believe that, upon a new trial, he could prove that "Spector realized a profit and not a loss in connection with his ownership of the Riverside Hotel property and transaction with OCM Corporation." Proof at trial showed that Spector netted from the sale of the property $66,000 in cash.

Spector's gain or loss from his involvement in the Riverside Casino and Hotel was not limited to what he realized from the sale of real property late in 1962. The IRS file, which was annexed to plaintiff's answering affidavits, supports Spector's claim at trial that he suffered total losses of approximately $770,000 in 1962 from loans and advances on account of OCM and the Riverside operation. Mermelstein has made no showing that any facts which could conceivably be developed would reduce Spector's losses to anywhere near the $250,000 for which judgment was granted. On any possible theory Spector's losses would still be considerably in excess of $600,000.

Indeed, at trial there was never any serious question by the defendant that Spector had lost considerably more than $250,000. The central issues at trial were what Mermelstein knew about OCM and Riverside at the time he advised Spector and acted as his attorney in connection with Spector's loans of $200,000 on March 12, 1962 and $50,000 on May 2, 1962, and whether Mermelstein had failed in his duty to advise Spector of what he knew or to act himself to protect his client.

During the eight years between bringing of suit in 1964 and trial, the defendant, represented at all times by able trial counsel, had explored in lengthy examination every facet of Spector's finances and his financial dealings regarding the Riverside Casino and property. Moreover, Spector testified at trial on March 13, 14, 15, 16, 24, 27 and 28, and he was recalled on April 12. The IRS records referred to were public records. In short, the defendant had every opportunity to explore these matters prior to trial and even during the trial. He failed to do so. On this record, for de-

fendant to allege that plaintiff has committed a fraud upon the court is wholly unwarranted.

### 2. Hotel Record of Harbor Island Spa, Inc., Miami, Florida, re Night of March 11, 1962

Mermelstein now asks opportunity to produce records of the Harbor Island Spa, Inc., for March 11 to March 15, 1962, to show that Spector was not there the night of March 11 and did not return there until March 15. Apparently this evidence is perceived as necessary to demonstrate that Mermelstein could not have communicated to Spector, before the $200,000 was sent to Reno, the knowledge he had acquired at the March 11 meeting at which a possible merger of Terry Industries and OCM Corp. was discussed. But Mermelstein never claimed that he attempted to reach Spector on that date, and it is wholly immaterial where Spector then was. The hotel record does not prove that Mermelstein was not able to communicate with Spector; on the contrary, he could easily have done so through Mrs. Spector who was at Harbor Island.

In any event, there is no reason why this proffered evidence should be considered now.

### 3. Minutes of June 15, 1962 Meeting of Trustees of the Teamsters Pension Fund

Mermelstein apparently claims that the minutes of the June 15, 1962, meeting of the Pension Fund trustees are inconsistent with Spector's testimony (SM 667–8) that he knew nothing of the real financial statements of the Riverside Hotel and Casino until September 1962. He asserts that he did not know of these minutes until sometime in August 1972 when he first talked with James Hoffa of the Teamsters Union.

The record shows that Mermelstein knew that Spector and Ehrens had attended a meeting of the trustees in June 1962; he knew this at that time or almost immediately thereafter. Apparently neither Mermelstein nor his counsel made any efforts between suit in 1964 and trial in March 1972 to ascertain

from the Teamsters Union what if any record of the meeting had been made. In any event, nothing that Spector said in June 1962 bears on what he knew on or before May 2, 1962, when the last $50,000 was advanced.

### 4. Frederick W. Wageman

Mermelstein now seeks to call Frederick W. Wageman as a witness claiming that he could testify concerning what he informed Spector regarding the affairs of OCM Corporation and the Riverside Casino prior to May 1, 1962. Wageman was hired by Spector to go to Reno in late April 1962 in order to ascertain the financial situation of the hotel and casino and to keep Spector advised. Neither party called him as a witness.

Wageman was at all times known to Mermelstein and, for all that appears, he was at all times available to Mermelstein. Neither Mermelstein nor Wageman give any reason why Mermelstein could not have ascertained the facts now alleged at length, and why Wageman could not have been called. Therefore, I do not credit Mermelstein's sworn statement that none of the facts in Wageman's affidavits were known to him or could have been reasonably known prior to the time of trial.

Nor does Exhibit A now produced by Wageman shed any new light whatever. It is an exact duplicate of Exhibit O introduced at trial. The five sheets of these exhibits are all dated May 10, 1962. Obviously it casts no new light on what Spector knew on or before May 2, 1962. Almost all the purportedly newly discovered evidence which Wageman's affidavit purports to cover is merely corroborative of evidence adduced at the trial.

Wageman's proffered evidence is in no sense newly discovered.

### 5. William V. Ehrens

Mermelstein also asks to call William V. Ehrens. Neither party called Ehrens at trial. Ehrens was present at the meetings of March 4, 6 and 11, 1962. Both before and for some months after March 1962 he was actively concerned with the operation and finances of the

Riverside Hotel and Casino. He and Spector parted company some time after he assisted Spector in his application for the mortgage from the Teamsters Fund. Subsequently Ehrens sued Spector. Ehrens also brought suit against Miller which action is still pending. During summation of Mermelstein's counsel the court inquired why Ehrens had not been called. The stenographer's minutes, pages 2394–95, show:

THE COURT: Before you get to that, let me interrupt. Neither side has produced errands [Ehrens] here. Does the record show whether he is still alive?

MR. LOTTERMAN: *I believe he is, your Honor. We had no point or purpose nor desire to call him because we felt the evidence that we had was so conclusive that it required no further testimony from anybody,* particularly in the light of the fact that Mr. Miller's deposition has been taken.

THE COURT: Does it show whether or not he was available?

MR. JACKSON: I don't know if he is alive, your Honor, nor do I know if he is available.

MR. LOTTERMAN: *Neither do I. My last information was that he was living down in Florida.* I think Mr. Jackson was present at a deposition which was taken of Mr. Spector involving Mr. Ehrens, but that is all I know. (Emphasis added)

Thus it is clear that the defendant made a deliberate decision not to call Ehrens as a witness. The affidavit of defendant's trial counsel, Joseph Lotterman, makes no mention of why Ehrens was not called.

According to the affidavits of Mermelstein and Ehrens, Ehrens did come to New York to be available to testify but left suddenly because of his son's illness, and therefore was incommunicado until after the trial. No good reason is given why Mermelstein was not able to reach him, as Mermelstein alleges he tried to do. Whatever the situation may have been, the defendant never advised the court that he wished to call Ehrens but was unable to reach him; nor did he ask for an adjournment to do so.

For these reasons, I do not credit the claim Mermelstein now makes that he wished to call Ehrens at trial but was unable to do so.

### 6. *Repayment of Bankers Trust Loan of March 12, 1962*

Mermelstein also sets forth certain evidence, allegedly newly discovered, which he claims shows that Spector intentionally distorted the facts regarding the $200,000 advance to OCM on March 12, 1962, by Bankers Trust Company. He claims that the bank was not repaid from the savings bank passbooks which Spector had put up as security. Mermelstein's affidavit recites a talk with a vice president of Bankers Trust Company which indicates that bank records show that the loan was repaid on October 15, 1962, when, "pursuant to Mr. Spector's instruction," the Bank charged Spector's account to satisfy the OCM note.

This allegedly newly discovered evidence makes no difference in the court's findings that in essence Spector made the loan of $200,000 and that he was never repaid. The details of how and when the Bank was paid by Spector are wholly immaterial. In any event, Mermelstein has shown no good reason why the details of repayment could not have been developed and why he could not have caused any relevant files to be produced at trial. This evidence Mermelstein now wishes to produce is not newly discovered, nor is it indicative of fraud on the court.

### 7. *Seymour Svirsky*

Mermelstein now asserts a new trial should be granted so that he may call Seymour Svirsky to testify about what happened on the meeting of March 11, 1962, in Ehrens' office. As with Ehrens, the defendant made a deliberate choice not to call Svirsky. Mermelstein makes no attempt whatever to explain why he was not called at trial.

Moreover, the court can give no weight whatever to what Mermelstein

claims Svirsky would testify, if sworn, which is set out in an affidavit which Mermelstein himself drew up allegedly in the belief that Svirsky would sign it, which Svirsky refused to do.

In short, there is no basis whatever for Mermelstein's assertion, under oath, that since the judgment he "has discovered new material evidence and facts which establish that fraud was committed on the part of the plaintiff, which misled and unduly influenced the decision of the trial court." The charge of fraud is reckless and wholly unsupported.

The motion is in all respects denied, with costs to the plaintiff.

Submit order on three days notice.