**Murray NEWMAN and Capitol Motors, Inc., Plaintiffs,**

**v.**

**Murray M. SILVER and Murray M. Silver, P.C. and Ralph LiButti, also known as Robert Presti, Defendants.**

**No. 80 Civ. 1775 (RWS).**

United States District Court,
S.D. New York.

Aug. 27, 1982.

As Amended Oct. 27, 1982.

Robert A. Katz, Flushing, N.Y., for plaintiffs.

Daniel H. Greenberg, New York City, for defendants Murray M. Silver and Murray M. Silver, P.C.

Woodcock & McClure, Hackensack, N.J., for defendant Ralph LiButti; Larry J. McClure, Hackensack, N.J., of counsel.

## OPINION

SWEET, District Judge.

This diversity action was commenced by Murray Newman ("Newman") against his former attorney Murray Silver ("Silver"), a resident of Georgia, and Ralph LiButti who was known to the parties at the time of the transactions in question as Robert Presti ("Presti"),[1] alleged without denial to be a New Jersey resident.[2] The complaint alleg-

---

**1.** Ralph LiButti also uses the name Robert Presti for reasons not explained, nor material, in this proceeding, and has chosen to be so designated here.

**2.** Presti was joined as a defendant in June, 1981 upon the application of Newman. Presti raised affirmative defenses of insufficiency of process and lack of personal jurisdiction. Newman moved to strike these affirmative defenses from his answer. In an opinion dated November 5, 1981 this court denied Newman's motion to strike the defenses since the defense fairly presented a question of fact that the court ought to hear. *Durham Industries, Inc. v. North River Ins. Co.,* 482 F.Supp. 910, 913

es causes of action for a breach of fiduciary duty, malpractice, fraud, and conversion. Upon the findings and conclusions set forth below, judgment will be entered on the first cause of action, and damages will be awarded in the amount of $169,300.00. The remaining causes of action will be dismissed.

The parties to this dispute would be readily recognized by O. Henry and Damon Runyon,[3] and it is regrettable that their skills and knowledge of the foibles of human conduct could not be combined to resolve the issues in this non-jury trial. The testimony, in its totality has presented a disturbing view of scenes behind the defense of a substantial criminal prosecution. As is so often the case, the convicted defendant, Newman, here seeks to blame his counsel, Silver, for his conviction and sentence and to recover amounts which he paid for legal services which he considers constituted malpractice, a breach of his attorney's fiduciary duty and worse.

*Findings of Fact*

In the fall of 1977 by virtue of a subpoena duces tecum served upon Capitol Motors, Inc. ("Capitol Motors") Newman, the company's president and chief executive officer and thirty percent shareholder, learned that the company, he and the company's other principal officer, Charles Romagnano ("Romagnano") were the targets of a grand jury investigation into the turning back of odometers ("clocking") by a number of used car dealers, some of which, like Capitol Motors, were located on Jerome Avenue in the Bronx. After consulting with his regular counsel, who advised that he had little familiarity with criminal proceedings, Newman retained Paul Perito, a former Assistant United States Attorney in this district, who had been suggested to him by his son, Gary Newman ("Gary").

At this early stage the indistinct outline of the role played by Presti emerges. Pres-

ti, by his own testimony, is a horseman, an owner, buyer and seller of horses, as opposed to a player. In that connection he met Gary, who was interested in horses, and a friendship developed. There is also evidence from Gary that Presti had sold substantial numbers of new, or virtually new, cars. For whatever reason, both Gary and Presti testified to the existence of a close relationship, characterized as approximating that of father and son. Gary attended family as well as horse gatherings with Presti. From time to time, prior to the times in question here, Presti had need of legal counsel and in particular had engaged Perito to represent him in connection with a tax case. Presti had recommended Perito to Gary Newman when the latter sought to obtain the necessary licensing to participate in the racing business in New York State. It was as a consequence of this representation that Gary Newman recommended Perito to his father when the investigation into clocking became known.

Perito collected documents, conferred with his client and made submissions to the government in an effort to prevent the filing of an indictment against Capitol Motors and Newman, but these efforts were unavailing. On April 17, 1978 a sixty-six count indictment was returned naming Capitol Motors, Newman and Romagnano as defendants. The indictment charged violations of the odometer statute, wire fraud and mail fraud. The case was assigned to the Honorable Constance Baker Motley of this court, who suggested at an early pretrial conference that in view of the possibility of conflicting interests, the individual defendants should consider separate counsel. Accordingly, Newman consulted Perito, who recommended Richard Givens, another former Assistant United States Attorney, who was known to have experience in the trial of wire and mail fraud charges. Givens was retained and undertook to rep-

(S.D.N.Y.1979). After the denial of the motion Presti elected to waive the objections to inadequate service of process and appeared to settle Presti's involvement once and for all.

3. *See* D. Runyon, *On Good Turns* in A Treasury of Damon Runyon, at 379 (C. Kinnaird 1958); O. Henry, *Jeff Peters as a Personal Magnet* in I, The Complete Works of O. Henry, at 272 (H. Hansen 1953).

resent Romagnano in cooperation with Perito. The two lawyers set about the preparation of the defense. Perito's fee agreement called for the payment of time charges, while Givens was to receive a fee of $100,-000 for representation through trial. Pretrial motions were prepared, argued, and determined, and the case set down for trial on August 23, 1978.

Late in July, preparation for trial was proceeding apace, and documents were being collected relating to the chain of title of the cars at issue. The application of the odometer statute with respect to cars destined for overseas shipment was the subject of research and discussion, since then, as now, Newman conceded the clocking with respect to such cars. According to Givens, the possibility of a viable defense turned upon the ultimate reach to be given the statute by the court and the ability of the government to establish the chain of title which was considered to be an essential element of its case. It was assumed that the government had obtained some evidence from one or more of the participants in the activities which were under indictment.

Both Givens and Newman describe in substantially similar terms a meeting which may well have been the critical one to set the events in motion which gave rise to this action. Newman with dogged determination pressed Perito for a personal evaluation of the case seeking an answer to the question "what would you do if you were in my situation." Perito refused to answer the question on the grounds of its impropriety and then finally acceded to the request by telling Newman that if he were Newman, he would seek to arrange a plea of guilty.

It was obvious to all those present, as it was obvious at this trial, that this was not the answer that Newman anticipated or wanted to hear. This shock is the best evidence of the reality which was being unpleasantly thrust upon him at his request. As a consequence of compelling Perito to answer his inquiry, Newman sought new counsel.[4] Gary asked Presti if he could arrange a consultation with Silver,[5] to whom Gary had been introduced by Presti during a trip to the Kentucky horse sales earlier in the spring.

Whether this introduction marked the first involvement in Newman's affairs by Silver or not was the subject of conflicting testimony. Gary testified that Presti, in an effort to be helpful, had previously asked Silver if he could find out anything about Newman's case, that Silver had done so and had reported that Perito had made unnecessary concessions to the government and had unduly complicated the case. Silver and Presti deny that this advice had been given, but it is conceded that at some time before Silver was retained, Newman had been told that Silver had represented the former governor of Georgia, Jimmy Carter, then President, and that he knew the then Attorney General of the United States, the Honorable Griffin Bell. Based on the testimony of Silver, these representations, standing alone, were accurate. In addition, Presti testified that in the course of seeking to sell

---

**4.** Newman testified without any documentary support that he consulted Irwin Klein at this point. In fact, the consultation took place earlier. In May, shortly after the return of the indictment Newman inquired of Presti through Gary whether Presti had any other counsel that he would be prepared to suggest. Presti had been sued by a client of Irwin Klein and had met Klein in the course of that proceeding. He arranged a meeting with Klein for Newman. Although Newman testified that this meeting occurred shortly before the Silver's retention, Klein's contemporaneous records indicate that the date of the interview was early in May, 1978. Klein stated that he would undertake the defense for $50,000, but for reasons unrelated to the fee Newman decided against the retention of Klein. The incident is of little relevance here except for the fee discussion, and the demonstration of the inaccuracy of certain of the recollections of the Newmans.

**5.** Silver is an attorney admitted to practice in the courts of Georgia since his graduation from the Georgia Law School in 1953. He testified that he has maintained his practice in Atlanta since then and served as general counsel to the Georgia Department of Labor from approximately 1964 to 1967. He also testified that on one occasion he presented lectures on jury trials to students at Morehouse College.

Silver a horse, he had visited Silver's Atlanta office in which was displayed a picture of Silver and the Carters. There is no evidence adduced by Newman to establish that Silver's information concerning Perito's conduct of the case, allegedly conveyed to Gary, was knowingly false. On the other hand, it is unquestioned that Silver's relationship to the President and the Attorney General was known to Newman at the time that he requested the initial interview with Silver.

Whether the arrangements for the first meeting on July 28 were arranged by Presti, as testified to by Gary, or by Gary assisted by Presti, is not important, for Presti testified that he talked with Silver before the latter came to New York and told him that if Newman failed to pay the agreed upon fee for the initial consultation, $10,-000, he, Presti, would pay the fee. A limousine was laid on at Presti's suggestion, and the morning after the initial telephone call Silver was met at LaGuardia Airport by Mr. and Mrs. Newman, Gary and Presti. They drove to the "21" Club, again at Presti's suggestion, and the case against Newman was discussed. The discussions at "21" went on for two or three hours after which the limousine took everyone present to the offices of Capitol Motors where Silver was given a check for $10,000, and then left town.

Both Gary and Murray Newman testified that in the car going to "21" on July 28 and while at the restaurant, there was discussion concerning the nature of the charges and the facts of the case and that after lunch while the discussion continued in the lounge area, Newman asked how much it would cost to have Silver represent the defendants, that Silver then left to confer with Presti outside of the hearing of the Newmans, that Presti returned alone and advised the Newmans that Silver would undertake the representation for a fee of $250,000 in cash to be made in two payments. Thereafter, according to the Newmans, they rejoined Silver who had been waiting in the limousine, and in the car on the trip to Jerome Avenue, accepted the terms of the fee arrangement. Presti, on the other hand, testified that he heard a discussion of fee arrangements which depended largely on the work to be performed and recalled that "there were some big numbers and there were some little numbers." Based upon all the evidence, and particularly the events that followed, I find that it was agreed that Silver would receive a substantial amount in cash in connection with his representation of the Newmans and Romagnano and Capitol Motors, although the details of how much, for what period of time or for what services were not specified.

July 28, the date of the "21" meeting, was a Friday, and Newman immediately set about raising cash. On Monday July 31 Milton Jacobs went to his bank, withdrew $25,000 and loaned it to Newman. Mrs. Newman also raised $25,000 as reflected in her bank records. According to Newman, he received $41,000 from his father and in addition took $7,000 which was in his house, making a total of $98,000 which was counted at the office of Capitol Motors on the afternoon of July 31. Since the amount was short of the anticipated $100,000, Newman testified that those present, including Romagnano, contributed whatever was available and thus raised another $2,000. After the money was collected, Gary placed it in his briefcase, picked up Presti, and they drove to Newark Airport. Presti left on the plane for Atlanta, called after arrival to say that the briefcase had been delivered and then returned to Newark where Gary picked him up and drove him home. Silver denied receiving any cash.

Silver returned to New York the following day, and the same participants had dinner at Laurent. According to Newman, he advised Silver that he could not raise the entire $250,000 in cash but that he would pay $50,000 by check, to which Silver replied that such a payment would increase his tax liability and therefore a check in the amount of $60,000 to offset the increased tax liability would be required. It is undisputed that a check in that amount was delivered by Newman to Silver that evening and deposited by the latter in his es-

crow account. Thereafter Silver transferred $30,000 to his personal account and wrote another $30,000 check to someone whose identity he no longer recalls.[6]

During the week of July 31 at a luncheon meeting at Bill Han's restaurant which followed a meeting between Silver and the prosecutor, Newman claims to have been advised by Silver that the prosecutor's file contained the following notations: 10 years —$450,000 fine—extensive publicity. Conferences concerning the case were held in Silver's suite in New York at the Sherry Netherland.

Over the weekend of August 6 Newman sought to raise additional funds and on Monday obtained $30,000 from Jeanette Gitter, an old friend who cashed a certificate of deposit for the purpose, the certificate having come due on August 7. Newman gave Mrs. Gitter three $10,000 notes, some of which have been paid. According to Newman he also received $4,000 from his father, $5,000 from his son Peter, $10,000 from Gary, as well as $22,000 from his own account at the Roslyn Savings Bank. According to Newman another $29,000 was obtained in cash from Capitol Motors. Documentary evidence was submitted to substantiate the loans from Mrs. Gitter, the sons and the withdrawal from the Roslyn Savings Bank, for a total of $67,000. Gary gathered the money, took it in a briefcase to Presti who on August 8, 1979, again travelled to Atlanta to deliver the briefcase which was returned to the Newmans during the following week.

Presti testified that he sought to assist the Newmans in any way he could and made the two trips to Atlanta with a briefcase given to him by Gary, which he delivered to Silver. He testified that he did not recall the dates of the trips and did not know the contents of the briefcase. He differed with Gary concerning the size of the briefcase, believing it to be larger.

Silver came to New York on August 9, 1979 and again during the week a round of conferences were held. In addition, at some time during this two week period, Silver took additional action which was carefully noted by the trial judge on the record and characterized as improper. Silver caused a call to be placed to the judge on Newman's behalf by Martin Luther King, Sr. The call was refused, a refusal which gave rise to a letter written by King on Newman's behalf. Silver also sought an ex parte meeting with the judge to explain his relationship with Andrew Young to dispel any suspicion that he should be stereotyped because he was white and came from Atlanta, Georgia. When his request was rejected Silver informed the judge's clerk of his purpose. While these acts were explained by Silver as unfamiliarity with the practices in this district, they are some evidence of the "powerful" aspect of Silver's representation on which Newman relied.

On August 15 a long meeting was held at Silver's suite, the entire case was reviewed, Presti was present, and considerable discussion revolved around the significance of the notation that Silver had reported to have been placed on the prosecutor's file. New-

---

**6.** The observant reader may question why these checks were never produced to ascertain the payees that Silver could not remember. Both parties had ample opportunity prior to trial to complete discovery, several extensions having been granted. Toward the conclusion of the trial, counsel for Newman was again given time to attempt to obtain these checks and a subpoena was issued on January 19, 1982 for the bank records. When it was determined on January 25, 1982 that Silver's accountant could not find the records, bank photocopies were obtained. The payee on the checks, however, did not appear on the bank records and counsel for Newman was again given an extension of time to attempt to obtain copies of the checks. Rather than serving a notice to take the deposition of the bank in Georgia, with an attendant subpoena duces tecum, counsel for Newman instituted an action in the Northern District of Georgia and had a subpoena issued for the bank records. The Honorable G. Ernest Tidwell quashed the subpoena and on March 16, 1982 Newman by order to show cause again moved for an extension of time to obtain the records in the proper manner. This request was denied and the trial proceeded the following day. Judge Tidwell's ruling was affirmed on appeal to the Fifth Circuit Court of Appeals and Newman has since filed a petition for a writ of certiorari on this issue.

man wept as he reviewed his alternatives and after conferring separately with Gary, decided to plead guilty. No contemporaneous documents were submitted by either Silver or Newman concerning this meeting or the decision to plead guilty.

On August 17 the plea was taken, and Newman testified before the judge with respect to his request to change his plea and the facts upon which the plea was based. A judgment of conviction was entered on the record, and sentencing was set for September 29, 1978. According to Newman, after the plea of guilty had been accepted, in a conversation in the hall it was suggested to him that it would be necessary to "have a seal," which Newman understood to be a means of insuring that a jail sentence would not have to be served. Newman testified that he was told that another $100,000 would be required for that purpose and consequently gave Silver four checks of $25,000 each, stating that the checks could not be cashed immediately because of a lack of funds and that he should be advised before any attempt to negotiate the checks.

On August 19, 1978, Newman concluded that he did not wish to make the requested payment and asked for the return of the checks. He met Presti over the weekend and was handed an envelope which contained three of the checks, one already having been cashed. Presti confirmed the meeting and the envelope, but not its contents. The checks were introduced into evidence over the objection of Silver who maintained that he had no knowledge concerning any check other than one check for $25,000 which had been cashed. As to that check, Silver deposited $12,500 in his personal account and wrote another check for $12,500, to a person whose identity he did not recall.[7] Pursuant to the understanding with the Government concerning his plea, Newman in Silver's company, made a number of trips to confer with F.B.I. agents during the next few weeks.

On October 6, 1978 Newman was sentenced to a term of imprisonment of 18 months. Newman did not deny Silver's account of their last meeting at Belmont, the day following the sentence at which time, according to Silver, Newman asked whether an additional payment of $25,000 could result in a deferment of the date on which Newman would have to report to commence the service of his sentence. It was also at that time that Newman suggested that any further discussions concerning the conduct of the case be handled by a friend of his in view of Newman's distraught condition. At this point Silver was contacted and according to him, threatened. Thereafter Silver was discharged, and Barry Slotnick, Esq. ("Slotnick"), was substituted in his place. Motions seeking to reopen the plea were made and argued on October 18, 1978 but withdrawn on October 25, 1978. On November 22, 1978 Judge Motley handed down a memorandum opinion in which she stated that because of the duplicitous nature of the charges, the sentence would be reduced to a term of imprisonment of four months.

Following this, Slotnick requested Silver to provide the $28,000 required for the fine imposed on the corporation. Lawrence Herrmann, an attorney then associated with Slotnick, called Silver in Atlanta. The Herrmann/Silver call was taped by Silver and the following passage occurred:

MR. SILVER: Oh Mr. Herrmann let me ask you this sir and I told Barry this, what would actually be the mechanics of it?

MR. HERRMANN: Well Barry told me that the money was not in a bank account right now.

MR. SILVER: Well but I will have to do that, I will have to put it in a bank account.

MR. HERRMANN: Okay Mr. Silver, (sigh) you know I, the corporation I think wrote you checks somewhere in the neighborhood of $95,000.00.

MR. SILVER: Right.

MR. HERRMANN: So we don't get into a battle between Newman and Romagnano, I think it would be lovely if it were a

7. See note 6 supra.

refunded fee to Capitol Motors, Inc. uhm rather than to either one of them as an individual.

MR. SILVER: Well I fully intended to put Capitol Motors name on it.

MR. HERRMANN: That's fine, but there's a very tough man in the U.S. Attorney's office called Mr. Jupiter, believe it or not.

MR. SILVER: Yes.

MR. HERRMANN: Who showed me the restraining order.

MR. SILVER: Yes.

MR. HERRMANN: He said if we didn't come up with the money by 4:30 today.

MR. SILVER: Well this is what I understand but this is what Barry said that you were going to tell me how it could be accomplished. I don't know how to get the money from here to New York.

MR. HERRMANN: Okay well one way would be to wire it, uhm the second way is this, I'm halfway between my home in Connecticut and New York City right now and I intended to call Mr. Jupiter which I can do from this phone booth I suppose and find out whether or not a certified check or a bankdraft to the United States of America delivered to the U.S. Attorney's office in Atlanta.

MR. SILVER: This is what Barry said that you were going to do that you were going to advise me whether or not that was possible.

MR. HERRMANN: Okay, well I can do that in five minutes.

MR. SILVER: 'Because I don't have any idea what it would cost to wire that money to New York.

MR. HERRMANN: It could be pretty expensive I think.

MR. SILVER: And so I think that probably what we should do Mr. Herrmann, we should take the money and convert it to a cashier's check and either give it to the U.S. Marshall here in Atlanta or whoever and let them call whoever in New York and say look I've got the money and this is what will be done.

Silver thereafter provided a bank check in the amount of $28,000 which was used to pay the fine imposed on the corporation.

The only written material submitted or prepared by Silver in the course of his representation was his adoption of a memorandum previously prepared by Givens and Perito. At the time of this trial Silver had no file and no bank records relating to his representation other than bank statements relating to his escrow and personal accounts. As to his office file, he had previously stated by way of affidavit in discovery proceedings that a temporary secretary had spilled coffee on the file, and that it had been thrown out because it was attracting insects. No evidence was presented that Silver had interviewed any witnesses other than the named defendants, conducted any research, prepared a trial memorandum or requests to charge, or engaged in many of the activities customarily undertaken on the eve of a substantial criminal trial.

While the testimony is consistent with respect to what Silver did, it is completely at variance with respect to the matter of fees, and each version strains credulity. On the one hand Newman testified that he was willing to pay $10,000 for an initial consultation plus fee of $260,000, $200,000 of which was cash, without a clear agreement as to what was covered by the fee, and that he was willing, albeit briefly, to pay an additional $100,000 after pleading guilty to insure that he would not have to serve a jail term, $25,000 of which he did pay, all this after having paid substantial sums on a time charge basis to the attorney who had been discharged. On the other hand Silver testified that no fee was ever agreed upon, that he received a total of $95,000 by three separate checks, and then undertook to pay the corporation's fine of $28,000 as well as $3,000 in disbursements and that he received no cash.

A preponderance of the evidence establishes that cash was turned over to Silver. The testimony of the two Newmans is rebutted directly only by Silver. Bank records show that Jacobs, Gitter, Gary, and Peter obtained cash at about the dates of

Presti's trips to Atlanta. Presti confirms the trips and carrying a briefcase, though he was uncertain as to the dates of the trips and the contents of the briefcase. It was suggested that the briefcase contained documents but the timing of the trips, Silver's presence in New York, the availability of air freight service also preclude such an inference. The only realistic purpose of Presti's conceded travel was the transportation of cash, particularly given Silver's return to New York the day following each such delivery. Perhaps the most significant evidence concerning the transmission of cash is Silver's acknowledgement in the Herrmann conversation that part of the fee had to be put into the bank in order to transmit it to New York. Incredibly, Silver explained the source of funds for the $28,000 bank check as money in his office safe resulting from gambling profits from a trip to Las Vegas and loans from two numbers operators in Atlanta, former clients, whose identity he chose not to reveal.

The unbelievability of Silver's testimony concerning the source of the $28,000 repaid to subsequent counsel for Newman, the conversation with Herrmann, the documentary evidence concerning the generation of cash by Newman, the absence of any contemporaneous Silver documents and the testimony of Jacobs, Gitter and the Newmans provides the preponderance necessary to tilt the evidentiary scales in favor of a finding that payments were made in cash to Silver in the following amounts:

| | | |
|---|---|---|
| 7/31/78 | Jacobs | $25,000 |
| 7/31/78 | Mrs. Newman | $25,000 |
| 8/6/78 | Gitter | $30,000 |
| 8/6/78 | Gary | $10,000 |
| 8/6/78 | Peter | $5,000 |
| 8/6/78 | Roslyn Savings | $22,000 |
| | | $117,000 |

This amount does not include the $29,000 Capitol Motors loan, since the corporate records submitted fail to establish a loan or a check in that amount.

Silver also received a $10,000 check for the initial consultation, a $60,000 check for services paid after the Laurent dinner and a $25,000 check after the plea. Thus the total fee paid of $212,000 was paid. With respect to the services to be performed by Silver for this rather staggering sum of money, Newman stated that he had intended to go to trial up until the moment that he was told of the notation on the prosecutor's file and that even thereafter he wished to go to trial but finally capitulated to the recommendations of Silver. He testified further that after the plea he agreed to pay another $100,000 for a seal, and transferred four $25,000 checks for that purpose, only one of which was negotiated before the agreement was rescinded.

From the firing of Perito, the background description of Silver, the nature of the cash, the influence sought to be brought to bear on the designated judge, and the events set forth above, I find that Newman expected a satisfactory outcome to the prosecution, whether by trial or plea, and that he was relying on his view of Silver's power to achieve that result, and that Silver was discharged, not because of the amount of the moneys paid over, but rather as a result of the sentence imposed. Further, I find that the plea was not induced by a false representation, allegedly the fictitious notations on the prosecutor's file, but rather because of Newman's recognition of his guilt and his belief that Silver would be able to obtain a satisfactory sentence notwithstanding. In any case, upon the entire record, including the allocution at the time of Newman's plea, I find that Newman did not rely on the representation concerning the prosecutor's file in connection with his determination to plead guilty.

There is no direct evidence that Presti received any portion of the cash that I have found he transported to Georgia, although checks in the amount of $30,000 and $12,500 to a payee or payees now unknown to Silver, were drawn immediately after the receipt of checks by Silver in double that amount. Although the relationship between Presti and Silver, both before and during the representation, was such to warrant an inference that Presti may have shared in the fee moneys paid, in the absence of any documentary or direct evi-

dence to that effect other than that already recounted, such a finding would amount to speculation, rather than reasonable inference.

### Conclusions of Law

■ Attorneys owe several duties of care in their relationships with clients and in the performance of legal services for their clients and are required to exercise an ordinary and reasonable level of skill, knowledge, care, attention and prudence common to members of their profession in the community. *Vitale v. Coyne Realty, Inc.,* 66 A.D.2d 562, 567, 414 N.Y.S.2d 388, 392 (4th Dept.1979); *Grago v. Robertson,* 49 A.D.2d 645, 646, 370 N.Y.S.2d 255, 258 (3d Dept.1975); *Siegel v. Kranis,* 29 A.D.2d 477, 479, 288 N.Y.S.2d 831, 834 (2d Dept.1968). Newman has alleged a cause of action for malpractice against Silver claiming that his services did not comply with this standard of care. A claim for malpractice, however, also requires a showing that the client's injury was caused by the attorney's malpractice or negligence. *Vitale v. Coyne Realty,* 66 A.D.2d at 567, 414 N.Y.S.2d at 392. This requires a showing that the result would have been altered in the underlying action had his attorney not been negligent. *N.A. Kerson Co. v. Shayne, Dachs, Weiss, Kolbrenner, Levy & Levine,* 45 N.Y.2d 730, 732, 408 N.Y.S.2d 475, 476, 380 N.E.2d 302, 303 (1978); *Parker, Chapin, Flattau & Klimpl v. Daelen Corp.,* 59 A.D.2d 375, 378–79, 399 N.Y.S.2d 222, 224 (1st Dept.1977); *Garguilo v. Schunk,* 58 A.D.2d 683, 683–84, 395 N.Y.S.2d 751, 752 (3d Dept.1977).

■ Newman has not established that he could have received a better result had Silver acted differently and therefore cannot recover on his negligence malpractice claim. I have found that there was in fact a basis for Newman's plea to the charges. Moreover, it has not been established that the plea was in any way coerced or involuntary.[8] Since there has been no showing

that Silver's handling of Newman's defense caused injury to Newman in the underlying criminal action, the malpractice claim fails.

■ An attorney, however, is also bound to conduct himself as a fiduciary or trustee occupying the highest position of confidence and trust. In all relationships with a client the attorney must exercise and maintain the utmost good faith, integrity, honesty, fairness and undivided loyalty. *Hafter v. Farkas,* 498 F.2d 587, 589 (2d Cir.1974); *Fund of Funds, Ltd. v. Arthur Andersen & Co.,* 567 F.2d 225, 233 (2d Cir. 1977); *Kelly v. Greason,* 23 N.Y.2d 368, 375–76, 296 N.Y.S.2d 937, 943, 244 N.E.2d 456, 460 (1968).

■ The issue therefore is whether Silver's fee arrangement evidenced a breach of this duty owed. It is recognized that contracts for compensation of an attorney by his client are not generally subject to revision by a court. N.Y.Jud.Law § 474 (McKinney 1968); *Application of Peters,* 271 A.D. 518, 523, 67 N.Y.S.2d 305, 310–11 (3d Dep't 1946), *modified* 296 N.Y. 974, 73 N.E.2d 560 (1947); *Sasson v. Ferris,* 231 A.D. 524, 526, 248 N.Y.S. 125, 128 (1st Dep't 1931). The court, however, does retain the traditional authority to supervise the charging of fees for legal services pursuant to the court's inherent power to regulate the practice of law. *First National Bank v. Brower,* 42 N.Y.2d 471, 474, 398 N.Y.S.2d 875, 876, 368 N.E.2d 1240, 1241–42 (1977); *Gair v. Peck,* 6 N.Y.2d 97, 106–07, 188 N.Y. S.2d 491, 497–98, 160 N.E.2d 43, 48–49 (1959), *cert. denied,* 361 U.S. 374, 80 S.Ct. 401, 4 L.Ed.2d 380 (1960); *Reisch & Klar v. Sadofsky,* 78 A.D.2d 517, 518, 431 N.Y.S.2d 591, 592 (2d Dep't 1980). Courts have the power to examine the agreement to make sure it is not unreasonable or oppressive where it was wrongfully procured, *Estate of Schanzer,* 7 A.D.2d 275, 277–78, 182 N.Y. S.2d 475, 478–79 (1st Dep't 1959), *aff'd,* 8 N.Y.2d 972, 204 N.Y.S.2d 349, 169 N.E.2d 11 (1960), *see generally* 7 N.Y.Jur.2d, *Attor-*

---

**8.** It should also be noted that a motion was made by Newman to withdraw his plea of guilty. This motion was ultimately withdrawn indicating that Newman may be collaterally

estopped from claiming that the plea was unfounded or coerced. *See Vavolizza v. Krieger,* 33 N.Y.2d 351, 355–56, 352 N.Y.S.2d 919, 922–23, 308 N.E.2d 439, 441–42 (1974).

neys at Law § 132 (1980), and have not hesitated to find agreements for compensation of attorneys invalid because they were unconscionable or "out of proportion to the value of the attorney's services." *Gross v. Russo,* 47 A.D.2d 655, 656, 364 N.Y.S.2d 184, 186 (2d Dep't 1975). *See also Maddox v. Fidelity Invest. & Title Co.,* 300 F.2d 1, 3 (4th Cir.), *cert. denied,* 371 U.S. 816, 83 S.Ct. 29, 9 L.Ed.2d 57 (1962); *In re Fitzsimons,* 174 N.Y. 15, 24, 66 N.E. 554 (1903) (when a court determines that an agreement was "induced by fraud, or that the compensation provided for was so excessive as to evince a purpose to obtain improper or undue advantage, the court may correct any such abuse."); 7 N.Y.Jur.2d, *Attorneys at Law* § 132 at 26 (1980).

Indeed the practical effect of a legal fraud can be found from the amount of the fee alone. In discussing the unconscionability of a contingency fee the court stated:

> [T]he amount of the fee standing alone and unexplained, may be sufficient to show that an unfair advantage was taken of the client, or in other words, that a legal fraud was perpetuated upon him.

*McCoy v. Gas Engine & Power Co.,* 135 A.D. 771, 772–73, 119 N.Y.S. 864, 865 (2d Dep't 1909). *See also Morehouse v. Brooklyn Heights R. Co.,* 185 N.Y. 520, 525–26, 78 N.E. 179 (1906); *Reisch & Klar v. Sadofsky,* 78 A.D.2d at 518, 431 N.Y.S.2d at 592. Although discussion of unconscionability most frequently arises in the context of a contingency fee arrangement, the doctrine is equally applicable under a contract based upon hourly rates, *see id.,* and therefore is also applicable to an unspecified fee arrangement as occurred in this case.

Under the facts and circumstances presented at trial, I conclude that Silver's actions evidence a breach of his duty of utmost fairness and loyalty owed to Newman. Without establishing a clear agreement on the price for his legal services, Silver over a period of time demanded and received what amounted to an exorbitant sum for his services. This is particularly evident, given the finding that his only services consisted of conferring with his client, reviewing some documents, arranging for and making improper overtures toward Judge Motley, copying verbatim and resubmitting a motion that had been submitted by prior counsel, conferring with the FBI, and representing Silver upon his plea of guilty and upon his sentence. There was no evidence of independent investigation, research or other work product by Silver. Although Newman may have paid the fees, the fact remains that Silver, in his fiduciary capacity, used his influence to obtain his demanded fee from Newman and sought and obtained an unfair advantage. The amount of the fee charged, particularly in light of the services rendered and the absence of a specific contract was sufficient to show that unfair advantage was taken. In substance a legal fraud was perpetrated on Newman by his attorney for which recovery should be granted. *Cf. Reisch & Klar v. Sadofsky,* 78 A.D.2d at 518, 431 N.Y.S.2d at 592.

As a result of this breach Newman was injured by virtue of his payment of a fee well in excess of a reasonable attorney's fee for the services rendered. Although the damage caused by the breach does not concern the effect of the services provided, *cf. Spector v. Mermelstein,* 361 F.Supp. 30, 38 n. 15, 39–40 (S.D.N.Y.1972), *aff'd in part, rev'd in part on other grounds,* 485 F.2d 474 (2d Cir.1973), damage was none the less caused by the payment of an excessive fee made possible by Silver's position of influence over Newman. Since a portion of the fee paid was obtained improperly and would unjustly enrich Silver, Newman can recover the amount paid in excess of a fair or reasonable legal fee.

Determination of a reasonable fee involves consideration of the time spent, the character and nature of services rendered, the complexity, difficulty and novelty of the case and the issues confronting the attorney, the attorney's standing in the bar and his professional reputation and experience, the skill exercised in handling the case, the possible consequences of the action and the result obtained. *See Kaufman v.*

*Diversified Industries, Inc.,* 356 F.Supp. 827, 831 (S.D.N.Y.1973); *In re Snell's Estate,* 17 A.D.2d 490, 493, 235 N.Y.S.2d 855, 858 (3d Dep't 1962). In making such a determination the court is itself an expert and can properly consider its own knowledge and experience concerning reasonable and proper fees and in light of such knowledge and experience and from the evidence presented, can form an independent appraisal of the services presented and determine a reasonable value thereof. *McAvoy v. Harron,* 26 A.D.2d 452, 454, 275 N.Y.S.2d 348, 351 (4th Dep't 1966), *aff'd,* 21 N.Y.2d 821, 288 N.Y.S.2d 906, 235 N.E.2d 910 (1968). Despite the absence of any time records, the evidence establishes that Silver travelled to New York for the initial consultation, worked a substantial part of each day on this matter from July 31 to August 16, excluding weekends for a total of twelve days, and thereafter he appeared at the sentencing and FBI interviews, a total of an additional five working days totalling eighteen working days in New York. Although the issues in the case may have been quite complex involving claims of title of the automobiles and statutory interpretation, no evidence has been adduced that Silver dealt with these issues. No case file was presented, and no work product was produced. The extent of the services rendered was largely limited to conferring with Silver. Although Newman ultimately received a moderate sentence, the evidence presented did not indicate any particular skill or expertise on the part of Silver responsible for that result.

I also note that Givens, an attorney with experience in wire and mail fraud charges had agreed to represent Romagnano through trial for $100,000, but that the capable attorneys who serve on our Criminal Justice Act Panel representing indigent defendants receive $30 per hour while in court and $20 per hour for work done out of court. Based upon all these factors and considerations and considering that no fixed contract was made, I conclude that on a *quantum meruit* basis Silver was entitled to at most a reasonable fee in the amount of $11,700.00.[9] Newman, therefore, is entitled to recover $169,300.00 which represents the difference between the reasonable fee and the $181,000.00 net amount [10] that Silver received.

Newman's complaint also alleges a claim for fraud against Silver based on the alleged statement by Silver that he had seen a notation on the file that the government would seek a ten year term of imprisonment, a $450,000 fine and extensive publicity and that this alleged misrepresentation caused injury to Newman. A cause of action for fraudulent misrepresentation requires a showing of a representation of a material fact, the falsity of that representation, scienter, reliance and damages. *Mallis v. Bankers Trust,* 615 F.2d 68, 80 (2d Cir. 1980), *cert. denied,* 449 U.S. 1123, 101 S.Ct. 938, 67 L.Ed.2d 109 (1981); *Jo Ann Homes at Bellmore, Inc. v. Dworetz,* 25 N.Y.2d 112, 119, 302 N.Y.S.2d 799, 803, 250 N.E.2d 214, 216–217 (1969); *Vitale v. Coyne Realty, Inc.,* 66 A.D.2d at 567, 414 N.Y.S.2d at 392; 24 N.Y.Jur., *Fraud & Deceit* § 14 at 47–48 (1962). Since I have found that Newman did not rely on the above statement in his decision to plead guilty, the requirement of reliance has not been established and therefore the claim is dismissed.

Newman also alleges that at the time Silver took the case he represented that he intended to take the case to trial while his actual intention was to have Newman plead guilty. Representations of opinion or predictions of some event that will occur in the future generally are not suffi-

---

**9.** Silvers' billing rates were not submitted, however, based upon the facts presented in this case $100 per hour provides ample compensation. The facts presented indicate that Silver worked at most an average of six and one-half hours per day including travel between New York and Atlanta which yields a total of $11,700.00 for the eighteen days worked. In light of all the circumstances of the case this amount represents a reasonable fee for the services provided by Silver.

**10.** This $181,000.00 net amount is equal to the $212,000.00 less the $31,000.00 Silver paid in fines and disbursements.

cient to state a cause of action for fraud. *Channel Master Corp. v. Aluminum Ltd. Sales, Inc.,* 4 N.Y.2d 403, 408, 176 N.Y.S.2d 259, 262, 151 N.E.2d 833, 835 (1958); *Chase Manhattan Bank, N.A. v. Perla,* 65 A.D.2d 207, 208, 411 N.Y.S.2d 66, 68 (4th Dept. 1978); *Burgundy Basin Inn, Ltd., v. Watkins Glen Grand Prix Corp.,* 51 A.D.2d 140, 144–45, 379 N.Y.S.2d 873, 876 (4th Dep't 1976). However, such a statement made with the knowledge or intention that the act would not occur is a sufficient statement of a material existing fact. *Channel Master Corp. v. Aluminum Ltd. Sales, Inc.,* 4 N.Y.2d at 406–07, 176 N.Y.S.2d at 262, 151 N.E.2d at 835; *Sabo v. Delman,* 3 N.Y.2d 155, 159–60, 164 N.Y.S.2d 714, 716, 143 N.E.2d 906, 907–908 (1957); *Chase Manhattan Bank, N.A. v. Perla,* 65 A.D.2d at 208, 411 N.Y.S.2d at 68. Although no evidence was presented of actual work by Silver done in preparation for trial, Newman has not sustained his burden of proving that at the time Silver allegedly stated that he intended to take the case to trial, he actually had no such intention.

Newman has also filed a claim against Presti for fraud. Presti allegedly stated that Silver had made inquiries into Newman's case, that Silver was a highly competent attorney whose personal friends included Jimmy Carter and Griffin Bell and that if Silver took Newman's case, Newman would have no worries. The statement concerning Silver's inquiries into the case is an insufficient basis for a claim of fraud, since there is no proof to establish that Presti did not believe it to be true. The statement that Silver knew Jimmy Carter and Griffin

Bell were, from the testimony presented, true at least to the best of Presti's knowledge. Finally the statement that Silver could obtain an acquittal was simply a matter of opinion and, hence, not actionable. The thrust of Presti's statements are that he considered Silver a competent attorney. There is no indication that Presti did not believe the truth of the statements when they were made. No cause of action for fraud has been proven on these grounds.

The final claim for relief is that Silver and Presti converted Newman's money when Presti delivered the briefcases with cash to Silver. To state a cause of action for conversion, Newman must have established his right to ownership or possession of the money and interference with that right to the exclusion thereof. *United States v. Santiago,* 528 F.2d 1130, 1135 (2d Cir.), *cert. denied,* 425 U.S. 972, 96 S.Ct. 2169, 48 L.Ed.2d 795 (1976); *Pierpoint v. Hoyt,* 260 N.Y. 26, 29–30, 182 N.E. 235 (1933); *General Electric Co. v. American Export Isbrandtsen Lines, Inc.,* 37 A.D.2d 959, 327 N.Y.S.2d 93, 95 (2d Dep't 1971). Here Presti and Silver were entitled to possession of the briefcases with money, since Newman gave the money to Presti with instructions to deliver it to Silver. *See Pierpoint v. Hoyt,* 260 N.Y. at 29–30, 182 N.E. 235; *O'Rourke v. O'Rourke,* 33 A.D.2d 698, 698, 306 N.Y.S.2d 184, 185 (2d Dep't 1969). They had the right to possession by virtue of Newman's actions. Moreover the evidence did not establish that Presti knew there was money in the briefcase. Consequently, the claim for conversion against Presti and Silver is dismissed.[11]

---

**11.** Newman in his post trial memorandum of law urges that Silver be required to forfeit all fees citing *Blackburn & Co. v. Park,* 357 F.2d 525 (2d Cir.1966) which stated that "[a]n agent that has thus disregarded its principal's interests cannot recover for services rendered." Although under certain circumstances an attorney may act as an agent of his client, *Blackburn* involved a broker who, while purportedly acting on his clients' behalf, in certain transactions was actually advancing the interests of others in that transaction. This case is inapposite as are the other cases cited by Newman. *See Catts v. Harft,* 124 Misc. 519, 208 N.Y.S.

446 (1st Dep't 1925), *Haskell v. Smith,* 90 N.Y.S. 353 (1st Dep't 1904), *Martin v. Bliss,* 57 Hun. 157, 10 N.Y.S. 886 (1st Dep't 1890), *aff'd,* 132 N.Y. 551, 30 N.E. 865 (1892).

Newman also seeks recovery under a provision of the New York Judiciary Law which provides:

An attorney or counselor who:
1. Is guilty of any deceit or collusion, or consents to any deceit or collusion, with intent to deceive the court or any party; or,
2. Wilfully delays his client's suit with a view to his own gain; or, wilfully receives any money or allowance for or on account of

Submit judgment on notice in accordance with these findings and conclusions within ten (10) days.

IT IS SO ORDERED.

any money which he has not laid out, or becomes answerable for,

Is guilty of a misdemeanor, and in addition to the punishment prescribed therefor by the penal law, he forfeits to the party injured treble damages, to be recovered in a civil action.

N.Y.Jud.Law § 487 (McKinney 1968). This section and its treble damage provision is not applicable to this case. Silver's actions, although involving extensive overreaching, do not amount to deceit or collusion as required by the statute. There is no basis for the treble damage recovery under this section.