713 F.2d 14
 Murray NEWMAN and Capitol Motors, Inc., Appellees-Cross-Appellants,
v.
Murray M. SILVER, Murray M. Silver P.C., and Ralph LiButti
a/k/a Robert Presti, Appellants-Cross-Appellees.
 Nos. 927, 928, Dockets 82-7789, 82-7813.
 United States Court of Appeals,
Second Circuit.
 Argued April 20, 1983.
Decided July 22, 1983.
 
 Murray M. Silver, P.C., appellant-cross-appellee, pro se.
 Michael L. Kingman, Hackensack, N.J. (Joseph C. Woodcock, Jr., Hackensack, N.J., of counsel), for appellant-cross-appellee LiButti.
 Robert A. Katz, Gandin, Schotsky & Rappaport, P.C., Melville, N.Y. (Roberto Lebron, Gandin, Schotsky & Rappaport, P.C., Melville, N.Y., of counsel), for appellees-cross-appellants Newman and Capitol Motors, Inc.
 Before LUMBARD, OAKES, and PIERCE, Circuit Judges.
 OAKES, Circuit Judge:
 
 
 1
 This case, here on cross-appeals, arises out of a complaint brought by New York clients (Capitol Motors, Inc., an auto dealership, and its president, Murray Newman) against their attorney (Murray Silver, Esq., of Atlanta, Georgia) and the fellow who brought lawyer and client(s) together, Ralph LiButti, also known as Robert Presti. Silver was paid, as the district court put it, the "staggering fee" of $212,000 to represent Newman and his dealership in connection with criminal charges brought in the Southern District of New York for violations of the odometer-fixing statute, wire fraud, and mail fraud. Newman and his corporation pleaded guilty, and, out of the fees paid Silver, the latter ultimately paid the corporation's fine of $28,000 as well as $3,000 in disbursements. The complaint here charged breach of fiduciary duty, malpractice, fraud and conversion on Silver's part and collusion and conversion on the part of LiButti. The United States District Court for the Southern District of New York, Robert J. Sweet, Judge, held in a bench trial that Silver had violated his fiduciary duty and awarded Newman $169,300, the difference between a reasonable fee and the $181,000 net amount (after disbursements and payment of the corporate fine) that Silver received. Newman v. Silver, 553 F.Supp. 485 (S.D.N.Y.1982). The court, however, found no liability on the part of LiButti who, inter alia, delivered briefcases which the court found contained cash to Silver from Newman. We affirm as to the award against Silver substantially on the findings and conclusions of Judge Sweet.[1] For reasons that we set out below, in the interests of justice and its administration, especially in light of the fact that while this appeal was pending Silver was admitted to the bar of this court, we remand on the cross-appeal for further findings with respect to both Silver and LiButti.
 
 
 2
 The theory of the case against LiButti was that through his racetrack-oriented friendship with Newman's son, Gary, LiButti had arranged a meeting between Silver and Gary leading to Newman's engaging Silver, for which LiButti was paid by Silver. It is suggested that the whole arrangement be viewed as a confidence game, that is, as a "sting" or "scam" in which the "mark," Newman, is led into parting with his money by the "con artists" who, while seemingly independent, are secretly conniving, one as a "shill" and the other as the "stingman," and who do not hesitate to get the "mark" to do something off-color (if not illegal) to make him, perhaps, unwilling to expose the "con." To support this theory, there was evidence that Silver, after he had already been paid $187,000 and Newman's plea of guilty had been accepted, obtained four $25,000 checks from Newman (only one of which was cashed) so that Newman could "have a seal," i.e., obtain, presumably by bribery of the trial judge or otherwise, assurance that a jail sentence would not have to be served. Newman changed his mind about making this payment and received back three of the four checks, which were delivered by LiButti, but Silver had cashed the fourth and deposited it in his trust account. From that account Silver deposited $12,500 in his personal account and wrote another check for $12,500 to a person whose identity he could not recall at trial. Silver's testimony about the $25,000 check is set out in the margin.[2]
 
 
 3
 In an earlier exchange, Newman had given Silver a check in the amount of $60,000 to offset Silver's income tax liability incurred from receiving part of his fees by way of checks rather than by way of cash. This check was also deposited in Silver's escrow or trustee account, following which Silver transferred $30,000 to his personal account and wrote another $30,000 check to someone whose identity he could not recall at trial. Silver's testimony about the $60,000 check is set out in the margin.[3]
 
 
 4
 While it may be that Silver writes $12,500 and $30,000 checks to so many people that he cannot recall their names, the fact that a client's fees are deposited in an escrow account and only 50% of them are taken out as fees could lead to several inferences, one of which is the inference that Silver was splitting his fees with someone, involving potentially serious breaches of the canons of ethics as well as of fiduciary and agency duties. This possible inference is particularly troublesome because LiButti, who brought the attorney and client together, was playing the role of courier.
 
 The district court said in its footnote 6:
 
 5
 The observant reader may question why these checks were never produced to ascertain the payees that Silver could not remember. Both parties had ample opportunity prior to trial to complete discovery, several extensions having been granted. Toward the conclusion of the trial, counsel for Newman was again given time to attempt to obtain these checks and a subpoena was issued on January 19, 1982 for the bank records. When it was determined on January 25, 1982 that Silver's accountant could not find the records, bank photocopies were obtained. The payee on the checks, however, did not appear on the bank records and counsel for Newman was again given an extension of time to attempt to obtain copies of the checks. Rather than serving a notice to take the deposition of the bank in Georgia, with an attendant subpoena duces tecum, counsel for Newman instituted an action in the Northern District of Georgia and had a subpoena issued for the bank records. The Honorable G. Ernest Tidwell quashed the subpoena and on March 16, 1982 Newman by order to show cause again moved for an extension of time to obtain the records in the proper manner. This request was denied and the trial proceeded the following day. Judge Tidwell's ruling was affirmed on appeal to the Fifth Circuit Court of Appeals and Newman has since filed a petition for a writ of certiorari on this issue.
 
 
 6
 553 F.Supp. at 491 n. 6.
 
 
 7
 In the ordinary case this would, of course, end the matter: Newman had the opportunity to obtain the information but did not go about it properly[4] and cannot now repair his mistakes; litigation must somewhere come to an end. But because Silver is an attorney at law, indeed now licensed to practice in this court, we believe the matter must be viewed in a different light. If in fact the checks Silver drew were drawn to LiButti or Presti, that would strongly indicate a breach of ethical canons on his part, possibly rendering him subject to restitution in this case of all fees received, as well as in all probability rendering LiButti liable to Newman jointly to the extent of the proceeds of Silver's checks. Since Silver has not posted a supersedeas bond in connection with his appeal, see Fed.R.Civ.P. 62(d); Fed.R.App.P. 8(a), this question of joint liability may well become important. We believe it may be of importance to the bar, to this court, and to the parties to ascertain the identity of the payee(s) of the two checks in question and to permit the taking of further evidence in connection therewith on the cross-appeal against appellees Silver and LiButti.
 
 
 8
 Judgment of liability against appellant Silver affirmed, but cause remanded for further findings; judgment for appellee LiButti vacated and remanded for further proceedings in accordance with this opinion. Costs to appellee-cross-appellant and against appellant-cross-appellee Silver. No costs to or from cross-appellee LiButti.
 
 
 
 [1]
 Silver's brief on appeal argues that the district court tried the case on a quantum meruit basis although quantum meruit was not mentioned in the complaint. But he misconceives the nature of federal pleading which is by statement of claim, not by legal theories. Fed.R.Civ.P. 8(a); 5 C. Wright & A. Miller, Federal Practice and Procedure § 1219; Gins v. Mauser Plumbing Supply Co., 148 F.2d 974, 976 (2d Cir.1945) (Clark, J.) ("particular legal theories of counsel yield to the court's duty to grant the relief to which the prevailing party is entitled, whether demanded or not")
 Judge Sweet quite properly found on the evidence he details that
 Under the facts and circumstances presented at trial, I conclude that Silver's actions evidence a breach of his duty of utmost fairness and loyalty owed to Newman. Without establishing a clear agreement on the price for his legal services, Silver over a period of time demanded and received what amounted to an exorbitant sum for his services. This is particularly evident, given the finding that his only services consisted of conferring with his client, reviewing some documents, arranging for and making improper overtures toward Judge Motley, copying verbatim and resubmitting a motion that had been submitted by prior counsel, conferring with the FBI, and representing Silver upon his plea of guilty and upon his sentence. There was no evidence of independent investigation, research or other work product by Silver. Although Newman may have paid the fees, the fact remains that Silver, in his fiduciary capacity, used his influence to obtain his demanded fee from Newman and sought and obtained an unfair advantage. The amount of the fee charged, particularly in light of the services rendered and the absence of a specific contract was sufficient to show that unfair advantage was taken. In substance a legal fraud was perpetrated on Newman by his attorney for which recovery should be granted.
 
 
 [553]
 F.Supp. at 496
 
 
 [2]
 Silver explained his receipt of the post-plea check for $25,000 as follows:
 Q. That is the fifteenth?
 A. Yes, sir. When I arrived there they would not grant me admission to the hotel. They said that the bill was not paid and that I could not stay there any longer.
 I became just absolutely crazy. I called Mr. Newman at his offices and I told him that. He said, don't get excited, there is nothing to it. I will be down there in a minute and he came down in a matter of minutes.
 He went to the office and explained to them that he was sorry, that it was an oversight, that it was supposed to be put on a credit card or something else and that he was just sorry that it happened.
 Whereupon, I was admitted to the Sherry Netherland Hotel. Sometime later during the week of August 14, Mr. Newman pled guilty on August 17, 1978.
 On August 16 Mr. Newman in our discussions concerning his guilty plea asked me would there be any way that I could guarantee to him that he would not go to jail.
 I told him that I could not guarantee that to him, that he carefully understood that.
 Whereupon he says to me it's worth $100,000 to me if you can guarantee it. I said, I cannot guarantee it and then, counsel, for the first time in my association with Mr. Newman, I became so upset that I actually cursed Mr. Newman out.
 I told him that I had been embarrassed; that I had been abused and that he had taken an advantage of me and embarrassed me when I couldn't be admitted to the hotel.
 We used loud words. We used obscenities, we used curse words and I told him, I said, if you have got $100,000 then you can give me $25,000 to help pay these expenses.
 At that time Mr. Newman walked around, he put his hand in his pocket, he walked around and he went out and he talked to I think it was Gary and he came back in and he threw the check to me, he didn't hand it to me, he threw it at me and said, here it is, he said, I hope you are happy.
 
 
 [3]
 In Silver's deposition he explains the reason for accepting the $60,000 check in the following testimony:
 Q. The $60,000, was that requested of Mr. Newman by you?
 A. No, sir. I think what Mr. Newman's intention was, when he gave me that check, was to give me something in anticipation of trying the case.
 At trial defendant Silver explained the $60,000 check as follows:
 Q. Why wasn't the $60,000 check deposited to your regular account?
 A. Mr. Lebron, I have no idea, sir, what it would have cost me to do all of the things that Mr. Newman wanted me to do in the defense of his case.
 Q. Wouldn't there have been expenses in the normal course of your profession?
 A. But you see the problem with that is that, generally speaking, an attorney doesn't want to spend money that he doesn't have and if we were going to incur the expenses of sending investigators and at one point in time, at one point in time it was discussed that Murray Silver go and then it was discussed that Mr. Newman would go and then it was discussed that Gary would go and then it was discussed that we disregard all of that and hire special investigators.
 Q. Did there come a time when you transferred these funds from your escrow accounts to your regular account?
 A. Did there come a time when I did that.
 Q. That is correct.
 A. I think I transferred a portion of them, sir.
 Q. Do you know when that was?
 A. No, sir, I don't, sir.
 The response that monies were held in the escrow account for forthcoming investigations was inconsistent with Silver's subsequent testimony as follows:
 Q. You made a deposit of $60,000, everybody knows that that is so, a check given to you by Capitol Motors. Do you remember that?
 A. Yes, sir.
 Q. A check given to you August 1, 1978?
 A. I cannot recall the particular date at this time when the check was given to me, sir, if that's what you are asking. I think August 1 was correct.
 Q. It has been established here that you were given a check on August 1, 1978 for $60,000.
 A. I think that's correct, sir.
 Q. The question is, were these two checks drawn by you, was the $60,000 the source of the two checks drawn by you each in the sum of $30,000 respectively on August 4, 1978 and August 11, 1978?
 A. Yes.
 
 
 [4]
 In fairness to counsel for Newman he did have an agreement with Silver's New York counsel that Silver would produce at trial all cancelled checks both on his personal account and his escrow account covering the time period in question (subject to claims of attorney-client privilege). Only in the midst of trial was it first learned that Silver did not have the checks and that his accountant had misplaced or "lost" the records because of an IRS audit and counsel then went after microfilm bank statements. We see no reason that the court could not have ordered Silver, a party before it, to have signed an authorization to his bank to furnish the name(s) of the payees on the two checks in issue, although following this appeal other procedure(s) may be necessary